**ENVIRONMENTAL TECHNOLOGIES COUNCIL, On behalf of itself and its members, Plaintiff,**

v.

**STATE OF SOUTH CAROLINA; Carroll A. Campbell, Governor; Commissioner, South Carolina Department of Health and Environmental Control; South Carolina Department of Health and Environmental Control; and South Carolina Board of Health and Environmental Control, Defendants,**

**and**

**Sierra Club, Energy Research Foundation, Citizens for Clean Air and Water, Environmentalists, Inc., and Citizens Asking for a Safe Environment, Inc. (CASE), Intervenor–Defendants.**

**Civ. A. No. 3:90–1402.**

United States District Court, D. South Carolina, Columbia Division.

April 13, 1995.

Stuart H. Newberger, Howard B. Crystal, Crowell and Moring, Washington, DC, Jeter E. Rhodes, Jr., McCutchen, Blanton, Rhodes & Johnson, Columbia, SC (David R. Case, General Counsel, Environmental Technology Council, Washington, DC, of counsel), for Plaintiff.

Charles Malony Condon, Attorney General, Kenneth P. Woodington, Senior Assistant Attorney General, Cameron B. Littlejohn, Jr., Assistant Attorney General, Columbia, SC, for State of South Carolina.

Treva G. Ashworth, Deputy Attorney General, Columbia, SC, for David M. Beasley, Governor of the State of South Carolina.

Carlisle Roberts, Jr., General Counsel, Jacquelyn S. Dickman, Assistant General Counsel, Columbia, SC, for Commissioner, South Carolina Department of Health and Environmental Control; South Carolina Department of Health and Environmental Control; and South Carolina Board of Health and Environmental Control.

Charles F. Lettow, Michael A. Mezzuchi, Cleary, Gottlieb, Steen & Hamilton, Washington, DC, for Defendants.

James S. Chandler, Jr., South Carolina Environmental Law Project, Pawleys Island, SC, Robert Guild, Columbia, SC, for intervenors Citizens for Clean Air and Water, Citizens Asking for a Safe Environment, Inc., and Environmentalists, Inc.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

PERRY, District Judge.

The plaintiff has moved for summary judgment, asserting that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Plaintiff seeks a declaration that certain executive orders, statutes and a regulation are invalid under the Interstate Commerce Clause of the United States Constitution.[1] Previously, this Court concluded that the plaintiff would probably prevail on the merits and entered a preliminary injunction. *Hazardous Waste Treatment Council v. South Carolina*, 766 F.Supp. 431 (D.S.C.1991).[2] That decision was affirmed by the United States Court of Appeals for the Fourth Circuit and remanded for modification of the preliminary injunction. 945 F.2d 781 (4th Cir.1991). Thereafter, the defendants and the intervenors filed motions to modify the preliminary injunction as directed by the Court of Appeals. The plaintiff has filed a motion for summary judg-

---

1. "Congress shall have the power.... [t]o regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. CONST. art. I, § 8, cl. 3.

2. The plaintiff has now changed its name from "Hazardous Waste Treatment Council" to "Environmental Technologies Council."

ment pursuant to Rule 56, Federal Rules of Civil Procedure. The Court has now considered the extensive memoranda submitted by the parties, together with the oral arguments and now enters its findings of fact and conclusions of law.

## I. PRIMARY JURISDICTION

■ At the September 20, 1994 hearing, this Court denied Defendants' Motion to stay and refer this case to the U.S. Environmental Protection Agency ("EPA") under the primary jurisdiction doctrine. Primary jurisdiction applies only to the referral of relevant *factual*, rather than *legal*, issues to a federal agency. *See Far East Conference v. United States*, 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952); *Nader v. Allegheny Airlines*, 426 U.S. 290, 304, 96 S.Ct. 1978, 1986, 48 L.Ed.2d 643 (1976). In this case, there are no material facts genuinely in dispute, and thus there are no factual issues requiring resolution by EPA.

■ Moreover, the constitutional issues raised here are properly within the traditional purview of an Article III court, and are not those to which EPA could conceivably lend some degree of expertise. *See Environmental Defense Fund v. Wheelabrator Technologies*, 725 F.Supp. 758, 775 (S.D.N.Y. 1989), *quoting Board of Educ. of City School Dist. v. Harris*, 622 F.2d 599, 607 (2d Cir. 1979), *cert. denied*, 449 U.S. 1124, 101 S.Ct. 940, 67 L.Ed.2d 110 (1981) ("It is well established that the courts need not defer to an agency where the issue involved is a strictly legal one, involving neither the agency's particular expertise nor its fact finding prowess"); *See also Sierra Club v. DOE*, 734 F.Supp. 946, 951 (D.Colo.1990) ("Where, as here, the issue is strictly legal, a court need not defer to a state agency"). In accordance with the mandate of the Fourth Circuit, this Court concludes that referral to EPA is not appropriate. *Hazardous Waste Treatment Council v. South Carolina*, 945 F.2d 781, 794 (4th Cir.1991) ("EPA may change its interpretation of its own regulation; however, we

cannot change the commands of the Constitution and Congress") ("HWTC II").

## II. MOTION TO MODIFY THE PRELIMINARY INJUNCTION

This Court has considered both Plaintiff's Motion for Summary Judgment and Defendants and Intervenors' Motion to Modify the Preliminary Injunction. Because summary judgment is appropriate, any modification of the preliminary injunction is now moot, and the motion to modify is denied. To the extent the permanent injunction issued herewith differs from the January 20, 1991 preliminary injunction, *see Hazardous Waste Treatment Council v. South Carolina*, 766 F.Supp. 431 (D.S.C.1991) ("HWTC I"), these changes are reflected below.

## III. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This case challenges South Carolina's discriminatory efforts to regulate the management of hazardous waste services located in the State.[3] At issue are two statutes, two executive orders, and one regulation which constitute an integrated and interconnected discriminatory program.

As this Court and the Court of Appeals concluded at the preliminary injunction stage, the State's discriminatory program violates the Commerce Clause. Because there are no material facts in dispute regarding the State's program, summary judgment is appropriate at this stage. *See Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); *Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992); *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources*, 504 U.S. 353, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992); *C & A Carbone, Inc. v. Town of Clarkstown, New York*, —— U.S. ——, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994); *Oregon Waste Systems, Inc. v. Dep't of Environmental Quality*, —— U.S. ——, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994); *National Solid Waste Management v. Alabama Dep't of Env't*, 910 F.2d 713

---

**3.** There are three facilities in South Carolina licensed to handle hazardous waste. The largest, located in Pinewood, is a disposal facility operat-

ed by Laidlaw Environmental Services of South Carolina, Inc. *See HWRC I*, 766 F.Supp. at 435.

(11th Cir.1990), *cert. denied,* 501 U.S. 1206, 111 S.Ct. 2800, 115 L.Ed.2d 973 (1991).

Initially, the State and Intervenors must come forward with competent evidence demonstrating a genuine issue of material fact for trial. Fed.R.Civ.P. 56(c). *See Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Defendants have failed to bring forward any evidence relevant to meeting this burden in the context of a case challenging facial discrimination against interstate commerce. *See, e.g., Wyoming v. Oklahoma,* 502 U.S. 437, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992); *Healy v. Beer Inst., Inc.,* 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989); *City of Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978).

In particular, none of the eight affidavits the State has provided raises a material fact in issue. The first, from Lewis Bedenbaugh of the Department of Health and Environmental Control ("DHEC"), addresses Superfund clean-up activities in South Carolina. (Exhibit 1, Defendant's Memorandum In Opposition to Motion for Summary Judgment.) The second and third, both by David Wilson of DHEC, address volumes of hazardous waste being treated, stored and disposed of in South Carolina and the permitting process. (Exhibits 2 and 3.) The fourth and fifth, both by John Buchanan of DHEC, address the transportation and record-keeping of hazardous waste in South Carolina, and the State enforcement program for hazardous waste facilities. (Exhibits 4 and 5.) The sixth, seventh, and eighth, all by Robert King of DHEC, address 1) hazardous waste management capacities in various states, 2) South Carolina's EPA authorization to administer its own hazardous waste management program, and 3) South Carolina's efforts to enter a Capacity Assurance Regional Agreement. (Exhibits 6–8.) While some of the attachments to these affidavits do provide breakdowns for in-state and out-of-state waste, none of the affidavits even *purports* to justify South Carolina's discriminatory treatment of out-of-state waste.

■ The State's failure to raise a factual issue for trial demonstrates, as a matter of law, that the State cannot carry its burden under the Commerce Clause's "strict scrutiny" standard. As the Court of Appeals noted, "[t]he Commerce Clause directly limits the power of the States to discriminate against interstate commerce." *HWTC II,* 945 F.2d at 789, *quoting New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 273, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988) ("New Energy"). A facially discriminatory program such as is at issue here is invalid " 'unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism.' " 945 F.2d at 790, *quoting Maine v. Taylor,* 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). "Justifying discrimination is difficult to say the least." *HWTC II,* 945 F.2d at 790. Where, as here, each of the challenged laws "do not regulate evenhandedly but discriminate on their face against out-of-state hazardous waste," *id.* at n. 13, there is a "virtually *per se* rule of invalidity...." *New Energy,* 486 U.S. at 278–79, 108 S.Ct. at 1810–11, *quoting Philadelphia v. New Jersey,* 437 U.S. at 624, 98 S.Ct. at 2535. Therefore, " 'the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives' " applies. *Wyoming v. Oklahoma,* 502 U.S. 437, 455, 112 S.Ct. 789, 801, 117 L.Ed.2d 1 (1982), *quoting Hughes v. Oklahoma,* 441 U.S. 322, 337, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979).

At the preliminary injunction stage this Court noted that, "[p]laintiff will likely succeed on the merits in their challenge to these actions under the Commerce Clause." *HWTC I,* 766 F.Supp. at 441. The Court also noted that, "[i]t may not be gainsaid that the public interest is best served when unconstitutional laws are enjoined." *Id.* at 442. At this stage, as Defendants have not come forward with any evidence demonstrating a genuine issue of material fact regarding the State's purported "legitimate local purpose" or the "absence of nondiscriminatory alternatives.", summary judgment is appropriate.

*A. Undisputed Material Facts*

*1. South Carolina's Discrimination Program*

The program challenged here has five interrelated components, comprised of two ex-

ecutive orders, two statutes, and one DHEC regulation. Together they compose one overall program designed to provide a system of preferential treatment for hazardous waste generators in-state at the expense of out-of-state generators.

Section 9 of Act No. 196 of 1989, which amends S.C.Code Ann. Section 44–56–130, and Executive Order ("E.O.") No. 89–17, the "blacklisting" provisions, prohibit the introduction into South Carolina of any hazardous waste from generators in particular states— those which, as determined by South Carolina: (1) prohibit treatment, storage or disposal of such waste within their borders, or (2) fail to enter into a regional or interstate agreement with South Carolina regarding the management of such wastes. *See HWTC I.* 766 F.Supp. at 436–37. This statute and order also require the State's treatment and disposal facilities to give preference to hazardous waste generators within the State. Section 5, Act. No. 196; S.C.Code Ann. 44–56–205; E.O. 89–17. The State and Intervenors have essentially abandoned any argument that these two laws pass muster under the Commerce Clause.

Act No. 590 of 1990, amending S.C.Code Ann. Section 44–56–59 and Section 44–56–60(a), and E.O. No. 89–25, the "quota" provisions, put inequitable limits on the amount of hazardous waste that can be disposed of in South Carolina. *See HWTC I,* 766 F.Supp. at 437–48. As proof of its discriminatory purpose, S.C.Code Ann. Section 44–56–59 provides:

(A) *The General Assembly finds:*

(1) The existing commercial land disposal facility in South Carolina [Pinewood] and available capacity in this State generally are limited resources;

(2) It is essential that the limited waste treatment and disposal capacity of the existing commercial facility [Pinewood] and the State in general be preserved, ready and available to ensure that the needs of South Carolina are met first;

(3) The existing commercial land disposal facility [Pinewood] as well as other hazardous waste treatment and disposal facilities must give preference to hazardous waste generators within the State for treatment and disposal of hazardous materials at licensed facilities in the State;

(4) The General Assembly [Act. No. 196] and the Executive branch [E.O. Nos. 89–17 and 89–25] have mandated restrictions on the importation of out-of-state wastes and on the capacity of existing hazardous waste landfills; and

(5) Reducing the amount of hazardous waste shipped to South Carolina commercial facilities will send a message to all states that South Carolina intends to reduce to the greatest extent possible the amount of hazardous waste treated and disposed of in this State.

(B) Based upon these findings the General Assembly declares that:

\*    \*    \*    \*    \*    \*

(2) As this State reduces its reliance on landfilling ..., the amount of hazardous waste being shipped into this State for landfilling from locations outside of the State should be reduced and eliminated also.

Accordingly, Section 44–56–60(a)(2) of Act No. 590 subjects Pinewood to a lowered disposal quota of 110,000 tons per year.[4] Of that quota, E.O. No. 89–25 sets aside 54,000 tons for hazardous waste "generated in South Carolina." Thus a substantial portion—45 percent of the overall quota—is reserved for South Carolina waste.

Section 44–56–60(a)(3) of Act No. 590 requires that Pinewood reserve *at least* as much capacity for in-state waste as the facility disposed during the previous twelve months. Thus, if more than 54,000 tons is disposed of by South Carolina, that new amount now serves as a floor for the next 12 months. Pinewood may not, however, accept *any more* out-of-state waste than it accepted during the previous twelve months. Thus, if Pinewood accepted less than 56,000 tons from its out-of-state customers over the previous twelve months, that *lower amount* now serves as a new *ceiling* for the next twelve

---

4. From July 1, 1990 to July 1, 1991, the capacity limit was 120,000 tons. After July 1, 1991, the 110,000 limit was to go into effect, except for this court's preliminary injunction.

months. South Carolina generators of waste thus benefit from preferential treatment contained in Section 44–56–60(a)(3), while out-of-state customers fight for access to the shrinking portion of the lowered 110,000 ton total.

Further, under E.O. No. 89–25 generator-customers located in other states may only utilize up to 35,000 tons of the overall out-of-state quota and not more than 10,000 tons per quarter. E.O. No. 89–25. South Carolina generators, then, are entitled to bring to Pinewood each year over 50% *more* waste than generators from any other one state (54,000 tons as compared with 35,000 tons).

The final element in this discriminatory program is DHEC Regulation 61–99. This regulation contains requirements for the permitting of new or expanded hazardous waste management facilities, including a "demonstration of need" for the new or expanded facility. Plaintiff does not challenge this regulation in its entirety. Instead, Plaintiff only seeks to declare invalid that portion which prohibits an applicant from including out-of-state waste in the demonstration of need: "[f]or the purposes of demonstrating need, Hazardous Waste generated outside the State of South Carolina shall not be included." DHEC Reg. 61–99, III(C). *HWTC I*, 766 F.Supp. at 436.

### 2. The State Has Failed To Demonstrate That Any Material Facts Are Genuinely In Dispute

Defendants argue that material facts remain in dispute which preclude summary judgment and require a trial. As each of the challenged provisions facially discriminates against interstate commerce, however, the State bears the extraordinarily high burden of demonstrating that (1) there is a legitimate local purpose for the discrimination, *and* (2) there are no non-discriminatory alternatives which could serve this purpose. *Wyoming v. Oklahoma*, 502 U.S. at 455, 112 S.Ct. at 801 ("'At a minimum such facial discrimination invokes the *strictest scrutiny* of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives'") (emphasis added), *quoting Hughes*, 441 U.S. at 337, 99 S.Ct. at 1736; *see also Maine v. Taylor*, 477 U.S. 131, 144, 106 S.Ct.

2440, 2450, 91 L.Ed.2d 110 (1986), *quoting Hughes; HWTC II*, 945 F.2d at 790 ("[j]ustifying discrimination is difficult to say the least"). Where, as here, each of the challenged laws "do not regulate evenhandedly but discriminate on their face against out-of-state hazardous waste," *id.* at n. 13, there is a "virtually *per se* rule of invalidity. . . ." *New Energy*, 486 U.S. at 278–79, 108 S.Ct. at 1810–11 *quoting Philadelphia v. New Jersey*, 437 U.S. at 624, 98 S.Ct. at 2535. The burden of overcoming the "virtually *per se* " rule is extraordinarily high, and it has been accomplished only once or twice over the entire history of the Nation.

South Carolina argues that it is entitled to a trial "to exercise its right to adduce evidence in justification of the purpose and basis for its challenged laws." (Memorandum in Opposition at 5). It is the State's position that this Court may not enter summary judgment simply because the Fourth Circuit did not resolve the matter "on the merits" at the preliminary injunction stage. *HWTC II*, 945 F.2d at 789 n. 11.

But this case is no longer at the preliminary injunction stage. In declining, "to decide the case on the merits at the early preliminary injunction stage," *id.*, the Fourth Circuit properly was drawing a distinction between a preliminary injunction motion and a decision on the merits. The present motion is for summary judgment, disposition of which is every bit an adjudication on the merits as a trial.

In particular, at the summary judgment stage, unlike the preliminary injunction stage, it is not sufficient for South Carolina to simply assert an "intention to produce evidence" at some future time. Rather, the time is now for the State to come forward with *actual* evidence to carry its burden under "strict scrutiny" and defeat summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 256, 106 S.Ct. at 2514 ("Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial"). This is particularly true where, as here, it must submit enough evi-

dence to overcome the heavy burden of the virtual *per se* rule of invalidity. *See generally Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett*, 477 U.S. at 322, 323, 106 S.Ct. at 2552, ("[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof").

Thus the State is obligated to demonstrate that there is a material fact genuinely in dispute. Mere incantations will not suffice at this stage of the litigation. Nonetheless incantations are all the State has provided on the essential issue: why discrimination against interstate commerce is necessary to achieve the State's allegedly legitimate purposes. In particular, South Carolina purports to list in its Memorandum in Opposition to Motion for Summary Judgment "factual matters" that "must be addressed." (Memorandum in Opposition at 9.) All of the factual issues listed in the Memorandum in Opposition and in the State's Statement of Material Facts, however, either (1) are undisputed at this stage (*i.e.*, the State's presumably legitimate purpose, which Plaintiff concedes for purposes of this motion only); (2) are irrelevant to the constitutional issues at hand; or (3) raise questions of law rather than questions of fact.

Assuming arguendo that the State possesses legitimate local purposes for placing certain restrictions on hazardous waste, in order to prevail the State must demonstrate that those goals cannot be achieved without facially violating the commerce clause: "[W]hatever [a state's] ultimate purpose, it may not be accomplished by discriminating against articles of commerce coming from outside the State *unless there is some reason, apart from their origin, to treat them differently.*" *Philadelphia v. New Jersey*, 437 U.S. at 627, 98 S.Ct. at 2537 (emphasis added); *see also Wyoming v. Oklahoma*, 502 U.S. at 454, 112 S.Ct. at 800 (discriminatory laws "will be struck down unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism") (citations omitted). The fatal flaw in South Carolina's program is that the State has failed even to suggest that it has some basis—other than state of origin—for discriminating against out-of-state waste. In fact, that is the reason for the discrimination. Thus, the State cannot justify such unconstitutional activity under any set of alleged facts.

Certainly Defendants' Statement of Material Facts does contain certain incantations regarding alternatives—"The South Carolina laws reflect the unavailability of neutral alternatives to achieving the State's legitimate purposes in the pertinent circumstances" (Statement of Material Facts at 2); "The failure of [EPA] and other States to license new or additional commercial land disposal capacity has severely restricted the availability of neutral alternatives for achieving the State's legitimate purposes" (*Id.* at 3). Nowhere in the record, however, is there evidence to support the assertion that neutral alternatives are not available.

Indeed, nowhere in the record has South Carolina argued that hazardous waste from out-of-state is *any different* from hazardous waste generated in-state. As noted by this Court and the Fourth Circuit at the preliminary injunction stage, there is no difference: "[h]azardous wastes generated out-of-state pose no more threat to human health and the environment than hazardous waste generated in South Carolina." *HWTC I*, 766 F.Supp. at 441–42, *quoted in HWTC II*, 945 F.2d at 788. In the absence of a *bona fide* distinction, any effort to discriminate against out-of-state waste solely because it is from out-of-state customers must fail. *See Philadelphia v. New Jersey*, 437 U.S. at 629, 98 S.Ct. at 2538 (because "there is no basis to distinguish out-of-state waste from domestic waste ... [the state's] legislative effort is clearly impermissible under the Commerce Clause ...").

The State has not presented any evidence to show the absence of nondiscriminatory alternatives. Although South Carolina has not precisely articulated its purposes, there appear to be several alleged concerns, all of which can be satisfied through nondiscriminatory means.

*First*, South Carolina mentions its concern for the "health, safety and welfare of its

citizens." However, as this Court expressly found (and the Fourth Circuit affirmed), "[h]azardous wastes generated out-of-state pose no more threat to human health and the environment than hazardous wastes generated in South Carolina." *HWTC I*, 766 F.Supp. at 441–42, *quoted in HWTC II*, 945 F.2d at 788. Accordingly, to the extent the State deems the existing comprehensive federal and State regulatory regimes insufficient to protect public health and safety, the State's interest can be served by *nondiscriminatory* hazardous waste management regulations that are applicable to *all* waste treated and disposed of within South Carolina. *See Philadelphia v. New Jersey*, 437 U.S. at 629, 98 S.Ct. at 2538; *accord New Energy*, 486 U.S. at 279, 108 S.Ct. at 1810.

Second, South Carolina also is concerned with preserving existing disposal capacity. As the Fourth Circuit held, however, it is impermissible for a state to "accord its own inhabitants a preferred right of access over consumers in other States to natural resources located within its borders." *Philadelphia v. New Jersey*, 437 U.S. at 627, 98 S.Ct. at 2537; *accord New England Power Co. v. New Hampshire*, 455 U.S. 331, 338, 102 S.Ct. 1096, 1099, 71 L.Ed.2d 188 (1982), *cited in HWTC II*, 945 F.2d at 792 ("South Carolina has little inherent right to use capacity located within its borders solely for waste generated within its borders"). The Commerce Clause thus bars any attempt to "conserve" hazardous waste capacity through discriminatory laws. If South Carolina is truly interested in preserving its in-state capacity, that interest would be served by the *bona fide* evenhanded regulations that apply equally to in-state and out-of-state waste generators. *See HWTC II*, 945 F.2d at 792 ("South Carolina may preserve the capacity by limiting total disposal and treatment within the state without reference to whether in-state or out-of-state waste is actually involved") (Footnote omitted). Moreover, the Supreme Court recently rejected the argument that protectionist and discriminatory measures are necessary "as landfill space diminishes and environmental cleanup costs escalate...." *Carbone*, — U.S. at —, 114 S.Ct. at 1683. As the Court held in *Carbone*, there has never been a showing "that the unobstructed flow of interstate commerce itself is unable to solve the local problems" which face all landfills around the country. *Id.*

*Third*, South Carolina makes mention of vague "transportation risks," again without distinguishing between wastes generated in-state and those generated out-of-state. There is no evidence that any of the challenged South Carolina laws even address this purported concern. However, even if South Carolina were interested in seeking to minimize the risks associated with transportation of hazardous waste, there would be several nondiscriminatory methods of addressing that interest. For example, South Carolina could increase the stringency of its regulations on an evenhanded basis, effectively addressing the State's putative transportation concerns by not exempting South Carolina waste or waste that is imported through South Carolina. With alternatives available to it, South Carolina cannot force *only* interstate commerce to bear the burden of its purported concerns.

■ Finally, it appears to be South Carolina's perception that certain other state's are not bearing their "fair share" of hazardous waste treatment and disposal. It thus has tried to influence the public policy of *other* states to compel them to take action. Suffice it to say that punishing other states is not a legitimate purpose under the Commerce Clause. *See HWTC II*, 945 F.2d at 791 (South Carolina does not have the authority "to punish certain hazardous waste generators merely because they reside in states that South Carolina concludes have not fulfilled obligations under CERCLA § 104(c)(9)"). Only Congress has the responsibility and power under the Constitution to impose national policy on individual states. Indeed, for South Carolina to try to impose its will on its neighbors is nothing more than one state making economic warfare on another of its sister states.

As for its purportedly legitimate local purpose, South Carolina asserts a range of general justifications. (See Statement of Material Facts ("South Carolina has legitimate purposes in protecting the health, safety and

welfare of its citizens"); ("South Carolina has a legitimate public purpose in taking actions to reduce reliance upon land disposal of hazardous waste"); ("South Carolina has a legitimate public purpose in taking measures to minimize the transportation of hazardous waste in the State"); ("South Carolina has a legitimate public purpose in taking measures to minimize the disposal of hazardous waste in the State"); ("South Carolina has a legitimate public purpose in carefully regulating the siting of new disposal facilities")).

■ South Carolina's emphasis on this "purpose," however, misses the point entirely. The general purpose of such laws are largely irrelevant when facial or substantial discrimination is involved. *See Philadelphia v. New Jersey,* 437 U.S. at 626, 98 S.Ct. at 2536 ("[t]his dispute about ultimate legislative purpose need not be resolved, because its resolution would not be relevant to the constitutional issue to be decided in this case"). Thus, it is "the discrimination [that must be] demonstrably justified by a valid factor unrelated to economic protectionism." *New Energy,* 486 U.S. at 274, 108 S.Ct. at 1807 (citation omitted). Every time the State grants a preference to in-state waste—by allowing that waste to be disposed in the State, or setting differential quotas, or barring consideration of out-of-state market needs and customers in determining whether a facility may be built or expanded—it is engaged in a form of protectionism the Constitution forbids by granting benefits to its citizens and businesses while denying them to those of other states. A state cannot seek to achieve a "presumably legitimate goal" by " 'the illegitimate means of isolating the State from the national economy.' " *Wyoming v. Oklahoma,* 502 U.S. at 455, 112 S.Ct. at 801, *quoting Philadelphia v. New Jersey,* 437 U.S. at 627, 98 S.Ct. at 2537. In other words, even if a state demonstrates a legitimate *purpose* for its laws, those laws are impermissible if that purpose is accomplished by discriminating *solely* on the basis of origin. Thus, the Supreme Court in *Philadelphia v. New Jersey* found the State's salutary motives irrelevant, stating:

> [I]t does not matter whether the ultimate aim of [the law] is to reduce the waste disposal costs of [the State's] residents or to save remaining open lands from pollution, for we assume [the State] has every right to protect its residents' pocketbooks as well as their environment.... But whatever [the State's] ultimate purpose, it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently.

437 U.S. at 626–27, 98 S.Ct. at 2536–37.

■ In addition, while it is evident from the alternatives South Carolina chose not to pursue that there are indeed nondiscriminatory alternatives, a close look at the program South Carolina *did* put into place reveals that the actual purpose of the program was to discriminate. In Act No. 590, Section 44–56–59(A)(1) reflects the State's clear and unmistakable efforts to discriminate by voicing concern about "limited resources" for disposal of hazardous waste. The next provision references South Carolina's demand that "the needs of South Carolina are met first" and that disposal facilities in the State must "give preference to hazardous waste generators within the State." *Id.* at (A)(2), (3). In addition, the two executive orders contain "whereas" clauses rife with indicia of the State's true purpose.

## B. *Conclusions of Law*

South Carolina is not the only state that has recently discriminated against the interstate waste services market. *See Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); *Chemical Waste Management, Inc. v. Hunt,* 504 U.S. 334, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992); *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources,* 504 U.S. 353, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992); *C & A Carbone, Inc. v. Town of Clarkstown, New York,* —— U.S. ——, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994); *Oregon Waste Systems, Inc. v. Dep't of Environmental Quality,* —— U.S. ——, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). *National Solid Waste Management v. Alabama Dep't of Env't,* 910 F.2d 713 (11th Cir.1990), *cert. denied,* 501 U.S. 1206, 111 S.Ct. 2800, 115 L.Ed.2d 973 (1991). As

the Fourth Circuit explained, these attempts to discriminate must fail:

> Perhaps most importantly, the effect of every state designing particular limits and bars for out-of-state waste could be catastrophic. Indeed, such treatment of hazardous waste—in essence, ensured nontreatment of some hazardous waste—might destroy not only the theoretical principle of a national economic union, but contains the real potential to destroy land, if not also persons, within the union.

*HWTC II*, 945 F.2d at 792 (citation omitted).

If South Carolina were entitled to enforce this program, *every state* could act similarly. The result would be states making economic war on other states in connection with the policies those states choose to pursue for hazardous waste treatment and disposal:

> The practical effect of the [discriminatory] statute must be evaluated not only by considering the consequences of the statute itself, but also considering how the challenged statute may interact with the legitimate regulatory regimes of other states and what effect would arise if not one, but many or every state enacted similar legislation.

*Healy v. The Beer Institute*, 491 U.S. at 336, 109 S.Ct. at 2499.

Thus, the constituent parts of South Carolina's program are unconstitutional, because they discriminate against out-of-state interests. Further, because those parts work together to compose an overall discriminatory program the entire program is unconstitutional.

Defendant's essentially agree that the blacklisting laws are invalid. They impose an embargo on *any* waste from generators in certain states. This is exactly the sort of discrimination the commerce clause prohibits:

> South Carolina's Act. No. 196 seems to punish certain hazardous waste generators merely because they reside in states that South Carolina concludes have not fulfilled

obligations under CERCLA 104(c)(9). But South Carolina does not appear to have been empowered to place penalties on businesses in such states.... And it seems unlikely that South Carolina can penalize its own citizens by prohibiting them from participating in interstate commerce with other states' citizens simply because that state has not met its obligations under CERCLA 104(c)(9). The Commerce Clause protects those "engaged in interstate commerce."

*HWTC II*, 945 F.2d at 791–2 (other citations omitted). Thus, Section 9 of Act No. 196, amending S.C.Code Ann.Section 44–56–130, must be enjoined. In addition, Section 5 of Act No. 196, which requires that preference be given to in-state generators, must also be enjoined. S.C.Code Ann. 44–56–205.

Similarly, all of the operative language of Executive Order No. 89–17 must be permanently enjoined. These provisions mirror Act No. 196 in blacklisting hazardous waste from certain other states and granting a preference for in-state waste.[5]

The quota laws are also invalid. They systematically discriminate against out-of-state businesses by allowing in-state generators to dispose of significantly more hazardous waste than out-of-state generators. Act No. 590 is thus invalid in its entirety. Defendants assert that the so-called "neutral cap" on disposal in Act No. 590 (S.C.Code Ann. 44–56–60(a)(2)) can be "divorced" from the rest of the State's discriminatory program even if the other discriminatory provisions were invalid. Defendants cite the Fourth Circuit's *dictum* that, with regard to the preliminary injunction, "South Carolina may preserve the capacity by limiting total disposal and treatment within the state *without reference* to whether in-state or out-of-state waste is actually involved." *HWTC II*, 945 F.2d at 792. As shown above, however, the so-called neutral cap on disposal is set forth in a statute which expressly references discrimination, both in the statute itself and in its references to the blacklisting statute

---

**5.** Plaintiff does not object to the Court's refraining from permanently enjoining the "whereas" sections of E.O. 89–25 and E.O. 89–17, as these do not contain any operative language. There-

fore, although these sections do indicate that the operative sections were designed in toto to discriminate, this Court need not enjoin them *per se.*

and executive order. *See* Act No. 590, Section 1, amending S.C.Code Ann. 44–56–59, at (A)(4). On that basis, this cap provision cannot be upheld in accord with the Fourth Circuit's mandate. Moreover, the Supreme Court recently held that a discriminatory program cannot be parsed into its otherwise valid but constituent parts. *West Lynn Creamery, Inc. v. Healy,* —— U.S. ——, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994). In *West Lynn,* Massachusetts sought to protect state dairy farming from interstate competition. To accomplish this objective, Massachusetts constructed a "two-part pricing order" program consisting of a cash/credit subsidy for state farmers and an "even-handed" tax on all dairy producers selling in the state, regardless of the producer's domicile. Analyzed separately, each of the Massachusetts provisions would likely have survived Constitutional challenge, a point the Supreme Court made clear. *Id.* at ——, 114 S.Ct. at 2214. Operating together as they did, however, the Court concluded the State had created an overall discriminatory program that could not withstand Commerce Clause scrutiny:

> [Massachusetts] errs in assuming that the constitutionality of the pricing order follows logically from the constitutionality of its component parts. By conjoining a tax and a subsidy, Massachusetts has created a program more dangerous to interstate commerce than either part alone. Nondiscriminatory measures, like the evenhanded tax at issue here, are generally upheld, in spite of any adverse effects on interstate commerce, in part because *"[t]he existence of major in state interests adversely affected ... is a powerful safeguard against legislative abuse...."* However, when a nondiscriminatory tax is coupled with a subsidy to one of the groups hurt by the tax, *a state's political processes can no longer be relied upon* to prevent legislative abuse, because one of the in-state interests which would otherwise lobby against the tax *has been mollified by the subsidy.*

> \*    \*    \*    \*    \*    \*

Respondent's argument would require us to analyze separately two parts of an integrated regulation, but we cannot divorce the premium payments from the use to which the payments are put. It is the entire program—not just the contributions to the fund or the distributions from that fund—*that simultaneously burdens interstate commerce and discriminates in favor of local producers.* The choice of constitutional means—nondiscriminatory tax and local subsidy—cannot guarantee the constitutionality of the program as a whole. *Id.* at ——–——, 114 S.Ct. at 2214–2215 (citations and footnote omitted). Thus, in *West Lynn Creamery,* the Court struck down all components of the State's discriminatory program, including the so-called neutral tax at issue there.

Similarly, Act No. 590 is invalid in its entirety, including the so-called neutral caps on disposal. Under *West Lynn Creamery,* it is not appropriate to assume that the South Carolina legislature would have enacted the (reduced) 110,000 ton cap in Section 44–56–60(a)(2) *without* the other discriminatory provisions, which reserve substantial disposal capacity for South Carolina generated waste (i.e., 54,000 tons, or 50% more than any other state). The disposal cap was not enacted in a vacuum. To the contrary, in-state generators are *not* adversely effected by the quotas because they received a further benefit at the expense of out-of-state generators. Thus in-state generators could not and did not serve as a "powerful safeguard against legislative abuse." *Id.*

Finally, Section III(C) of DHEC Regulation 61–99 must be declared invalid and permanently enjoined. It is certainly within DHEC's authority to make certain restrictions with respect to the permitting of new and expanded hazardous waste facilities under RCRA. It is simply beyond the agency's authority, however, to create discriminatory restrictions which consider "in-state needs" only to the exclusion of the needs of *all* the customers who bring waste into South Carolina. It is difficult to conceive of a more obvious effort to hoard the economic resources of a state and to isolate that state from interstate commerce. The Fourth Circuit itself acknowledged the unconstitutionality of this provision, remanding not on the merits of its invalidity, but only on the "bal-

ance of hardships" for the issuance of a preliminary injunction. The Fourth Circuit noted that Plaintiff "appears to have a substantial argument that Regulation 61–99 is unconstitutional," *HWTC II*, 945 F.2d at 788, because it:

> ... appears to be an attempt to *block South Carolina from the nationwide problem. On its face. Regulation 61–99 appears not to regulate evenhandedly.* It permits South Carolina to refuse to allow new construction if all of its waste can be disposed of by exportation. The "practical effect," *Healy*, 491 U.S. at 332, 109 S.Ct. at 2497, *of the regulation may be to favor instate interests over out-of-state interests.*

*HWTC II*, 945 F.2d at 791 n. 14 (emphasis added).

South Carolina has a range of administrative, legislative and cooperative remedies available to ameliorate its concerns regarding how other states are dealing with hazardous waste issues. *See generally South Carolina v. Reilly Admin. of EPA*, No. 91–3090 (D.D.C. filed Nov. 25, 1991) (complaint that Court prevent EPA "from releasing or earmarking federal hazardous waste cleanup funds under CERCLA to states such as North Carolina whose failure to meet certain statutory conditions renders them ineligible for the funds"). However, South Carolina cannot solve its perceived problem through a program which violates the Commerce Clause.

## IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED:

1. Sections 5 and 9 of Act No. 196 of 1989, amending S.C.Code Ann. Section 44–56–205 and Section 44–56–130, are declared invalid and are permanently enjoined;

2. Executive Order No. 89–17, from the words "Now therefore" onward is declared invalid and is permanently enjoined;

3. Act No. 590 of 1990, amending S.C.Code Ann. Section 44–56–59 and S.C.Code Ann. Section 44–56–60 is declared invalid and is permanently enjoined;

4. Executive Order No. 89–25, from the words "Now therefore" onward is declared invalid and is permanently enjoined; and

5. South Carolina Department of Health and Environmental Control Regulation 61–99(III)(C) is declared invalid and is permanently enjoined.

IT IS SO ORDERED.