**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ENVIRONMENTAL TECHNOLOGY
COUNCIL, formerly known as
Hazardous Waste Treatment
Council, on behalf of itself and its
members,
Plaintiff-Appellee,

v.

SIERRA CLUB; ENERGY RESEARCH
FOUNDATION; CITIZENS FOR CLEAN AIR
AND WATER; CITIZENS ASKING FOR A
SAFE ENVIRONMENT, INCORPORATED
(CASE); ENVIRONMENTALISTS,
INCORPORATED,                                        No. 95-2008
Defendants-Appellants,

and

STATE OF SOUTH CAROLINA; DAVID
M. BEASLEY, Governor;
COMMISSIONER, SOUTH CAROLINA
DEPARTMENT OF HEALTHAND
ENVIRONMENTAL CONTROL; SOUTH
CAROLINA DEPARTMENT OF HEALTH
AND ENVIRONMENTAL CONTROL;
SOUTH CAROLINA BOARD OF HEALTH
AND ENVIRONMENTAL CONTROL,
Defendants.

ENVIRONMENTAL TECHNOLOGY
COUNCIL, formerly known as
Hazardous Waste Treatment
Council, on behalf of itself and its
members,
Plaintiff-Appellee,

v.

STATE OF SOUTH CAROLINA; DAVID
M. BEASLEY, Governor;
COMMISSIONER, SOUTH CAROLINA
DEPARTMENT OF HEALTHAND
ENVIRONMENTAL CONTROL; SOUTH
CAROLINA DEPARTMENT OF HEALTH                                    No. 95-2245
AND ENVIRONMENTAL CONTROL;
SOUTH CAROLINA BOARD OF HEALTH
AND ENVIRONMENTAL CONTROL,
Defendants-Appellants,

and

SIERRA CLUB; ENERGY RESEARCH
FOUNDATION; CITIZENS FOR CLEAN AIR
AND WATER; CITIZENS ASKING FOR A
SAFE ENVIRONMENT, INCORPORATED
(CASE); ENVIRONMENTALISTS,
INCORPORATED,
Defendants.

Appeals from the United States District Court
for the District of South Carolina, at Columbia.
Matthew J. Perry, Jr., Senior District Judge.
(CA-90-1402-3-0)

Argued: March 5, 1996

Decided: October 15, 1996

2

Before MURNAGHAN and MOTZ, Circuit Judges, and
YOUNG, Senior United States District Judge for the District of
Maryland, sitting by designation.

_____

Affirmed by published opinion. Judge Murnaghan wrote the opinion,
in which Judge Motz and Senior Judge Young joined.

_____

## COUNSEL

**ARGUED:** Charles Frederick Lettow, CLEARY, GOTTLIEB,
STEEN & HAMILTON, Washington, D.C.; James Stuart Chandler,
Jr., SOUTH CAROLINA ENVIRONMENTAL LAW PROJECT,
Pawleys Island, South Carolina, for Appellants. Stuart Henry New-
berger, CROWELL & MORING, Washington, D.C., for Appellee.
**ON BRIEF:** Robert Guild, Columbia, South Carolina; Michael A.
Mazzuchi, CLEARY, GOTTLIEB, STEEN & HAMILTON, Wash-
ington, D.C.; Charles Molony Condon, Attorney General of South
Carolina, Treva G. Ashworth, Deputy Attorney General, Kenneth P.
Woodington, Senior Assistant Attorney General, Cameron B. Little-
john, Jr., Assistant Attorney General, Columbia, South Carolina; Car-
lisle Roberts, Jr., General Counsel, Jacquelyn S. Dickman, Assistant
General Counsel, Columbia, South Carolina, for Appellants. Howard
B. Crystal, CROWELL & MORING, Washington, D.C.; Jeter E.
Rhodes, Jr., MCCUTCHEN, BLANTON, RHODES & JOHNSON,
Columbia, South Carolina; David Case, General Counsel, ENVIRON-
MENTAL TECHNOLOGY COUNCIL, Washington, D.C., for
Appellee.

_____

## OPINION

MURNAGHAN, Circuit Judge:

The appeal before the court concerns South Carolina's attempt to
limit the amount of hazardous waste generated out-of-state and buried
within its borders by promulgating a series of executive orders, stat-

3

utes, and one regulation (collectively "the South Carolina laws") which, as compared to treatment of waste generated within South Carolina, burden out-of-state waste. The discriminating state laws would impact the operations of three commercial hazardous waste facilities owned and operated by members of the appellee-plaintiff Environmental Technologies Council ("ETC"). **1** ETC filed a lawsuit challenging South Carolina's laws under the Commerce Clause of the United States Constitution, art. I, § 8, cl.3, the Supremacy Clause, art. VI, cl. 2, and the Privileges and Immunities Clause, art. IV, § 2 cl.1, and 42 U.S.C. § 1983 (1988). The question before the court on appeal is whether South Carolina's laws violate the Commerce Clause.**2**

We previously considered a motion by ETC for a preliminary injunction in this same lawsuit based on a Commerce Clause violation. Hazardous Waste Treatment Council v. State of South Carolina, 945 F.2d 781 (4th Cir. 1991) ("HWTC"). While remanding to the district court, we, for the most part, affirmed the district court's grant of a preliminary injunction in favor of ETC.**3** On remand, the district court has granted summary judgment in favor of ETC, issuing a permanent injunction as to all the challenged provisions. Environmental Technologies Council v. South Carolina, 901 F. Supp. 1026 (D.S.C. 1995) ("ETC"). South Carolina and several intervenors have appealed. For the following reasons, we affirm.

_____

**1** ETC was formerly known as the Hazardous Waste Treatment Council ("HWTC"). ETC is a non-profit association of commercial firms that provide services for the treatment, recycling, and disposal of hazardous wastes.

**2** Because the district court addressed only the Commerce Clause question and our ruling on the Commerce Clause renders the challenged laws invalid, we do not reach the validity of the laws under the Supremacy Clause, Privileges and Immunities Clause, or 42 U.S.C. § 1983.

**3** We instructed the district court on remand "(1) to modify the order by striking the words that confusingly imply a declaration of invalidity, (2) to modify the order to apply only to the specific portions of the executive orders and statutes challenged as violating the Commerce Clause, and (3) to consider explicitly the balance of hardships with respect to Regulation 61-99." HWTC, 945 F.2d at 795.

4

I

Disposing of hazardous wastes is a national problem which raises complex technological and political issues.**4** South Carolina is one of few states which contain commercial hazardous waste treatment, stor-

_____

**4** The Resource Conservation and Recovery Act of 1976 ("RCRA") defines "hazardous waste" as

>a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may --

>(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

>(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5).

The increasing problem of disposing of solid wastes--hazardous and non-hazardous--is evidenced by the number of recent lawsuits involving states' or localities' attempts to limit wastes entering their borders. See, e.g., C & A Carbone, Inc. v. Town of Clarkstown, New York, 511 U.S. 383 (1994) (local solid waste flow control ordinance requiring all nonhazardous waste to be deposited at locally-owned facility); Oregon Waste Sys., Inc. v. Department of Envtl. Quality of Oregon , 511 U.S. 93 (1994) (Oregon statute imposing additional fee on solid waste generated outside the state and disposed of within the state); Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources, 504 U.S. 353 (1992) (Michigan law prohibiting private landfill operators from accepting solid waste that originates outside county in which facilities are located unless specifically authorized by the receiving county's plan); Chemical Waste Management, Inc. v. Hunt, 504 U.S. 334 (1992) (Montana statute imposing additional fee on all hazardous waste generated out of state and disposed of within state); City of Philadelphia v. New Jersey, 437 U.S. 617 (1978) (New Jersey statute prohibiting importation of most solid or liquid waste generated out of state); National Solid Wastes Management Ass'n v. Alabama Dep't of Envtl. Management, 910 F.2d 713 (11th Cir. 1990), as modified upon denial of reh'g, 924 F.2d 1001 (11th Cir.), cert. denied, 501 U.S. 1206 (1991) (Alabama statute blacklisting certain hazardous wastes generated out of state). In each case listed above a state or locality attempted to discriminate against waste generated out-of-state, and in each case the discriminatory action was ruled a violation of the Commerce Clause.

age, and disposal facilities. Thus, South Carolina absorbs a large amount of the hazardous waste that other states export.

South Carolina's attempt to limit the level of out-of-state hazardous waste entering its borders occurs against a backdrop of congressional legislation addressing the national hazardous waste problem. Congress has enacted three sets of laws which are relevant here: (1) the Resource Conservation and Recovery Act of 1976 ("RCRA"), as amended, 42 U.S.C. §§ 6901-6992k (1988); (2) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. §§ 9601-75 (1988); and (3) the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99-499, 100 Stat. 1613 (1986). We briefly describe each law in so far as it is relevant to the question before us.

A. RCRA

RCRA establishes a cradle-to-grave regulatory program for hazardous waste management administered by the Environmental Protection Agency ("EPA"). It attempts to deal with hazardous waste before it becomes a problem by establishing minimum federal standards for the generation, treatment, storage, transportation, and disposal of hazardous waste, and the permitting of facilities to treat hazardous waste. HWTC, 945 F.2d at 783. RCRA also allows a state to implement its own program in lieu of the federal program if the state's program is "equivalent to" and "consistent with" the federal or state programs applicable in other states and provides for "adequate enforcement of compliance." 42 U.S.C. § 6926(b).

Congress delegated to EPA the task of reviewing and authorizing state programs as consistent with the federal program. The EPA's regulation explaining how a state's program must be consistent with the federal program is of particular relevance to the present controversy. It requires that a state program not unreasonably impede interstate commerce.[5]

_____

[5] 40 C.F.R. § 271.4. provides:

> To obtain approval, a State program must be consistent with the Federal program and State programs applicable in other States and in particular must comply with the provisions below . . .

6

B. CERCLA and SARA

Passed by Congress in 1980, CERCLA establishes a cleanup pro-
gram for hazardous waste which has already been disposed of
improperly. CERCLA created a fund of federal money available for
state cleanup efforts ("Superfund").

Finding that more was still needed to address the hazardous waste
problem, Congress amended CERCLA in 1986 by enacting SARA.
SARA requires that each state submit a proposal to EPA demonstrat-
ing that over a 20-year period the state will have either: (1) adequate
capacity available to dispose of hazardous wastes generated within
the state; or (2) arrange for the disposal of wastes generated in-state
in other states through interregional agreements. 42 U.S.C.
§ 9604(c)(9) (1995).[6] The required plans are referred to as Capacity

_____

> (a) Any aspect of the State program which unreasonably
> restricts, impedes, or operates as a ban on the free movement
> across the State border of hazardous wastes from or to other
> States for treatment, storage, or disposal at facilities autho-
> rized to operate under the Federal or an approved State pro-
> gram shall be deemed inconsistent.

[6] 42 U.S.C. § 9604(c) provides:

> (9) Siting

> Effective 3 years after October 17, 1986, the President shall not
> provide any remedial actions pursuant to this section unless the
> State in which the release occurs first enters into a contract or
> cooperative agreement with the President providing assurances
> deemed adequate by the President that the State will assure the
> availability of hazardous waste treatment or disposal facilities
> which--

> (A) have adequate capacity for the destruction, treatment,
> or secure disposition of all hazardous wastes that are reason-
> ably expected to be generated within the State during the 20-
> year period following the date of such contract or coopera-
> tive agreement and to be disposed of, treated, or destroyed,

> (B) are within the State or outside the State in accordance
> with an interstate agreement or regional agreement or
> authority,

7

Assurance Plans ("CAPs"). Failure to submit an acceptable CAP results in the state becoming ineligible to receive Superfund money for remedial cleanup of hazardous waste within the state. Congress promulgated no other sanctions or incentives for states to submit CAPs.[7]

C. South Carolina's Restrictions on the Interstate Flow of
      Hazardous Waste

Because South Carolina is one of the few states which has large existing hazardous waste treatment and disposal facilities, it contends that it has borne an unfair share of the national hazardous waste burden. As a result, South Carolina has attempted, through a series of measures, to reduce the amount of hazardous waste entering its borders. South Carolina's legislature passed two statutes, its Governor signed two Executive Orders, and the South Carolina Department of Health and Environmental Control ("DHEC") promulgated one regulation--all of which were designed to limit the level of out-of-state hazardous wastes entering South Carolina for burial within the state.

The first measure enacted was a blacklisting provision, prohibiting entry into the state of certain out-of-state wastes. Section 9 of Act No. 196 of 1989 prohibits "any person who owns or operates a waste treatment facility within" South Carolina from accepting

> any hazardous waste generated in any jurisdiction which prohibits by law the treatment of that hazardous waste within that jurisdiction or which has not entered into an interstate or regional agreement for the safe treatment of hazardous waste pursuant to the federal [CERCLA].

_____

> (C) are acceptable to the President, and

> (D) are in compliance with the requirements of subtitle C of the Solid Waste Disposal Act.

[7] The court refers the reader to its prior opinion in this litigation, HWTC, 945 F.2d at 783-85, for further background on RCRA, CERCLA, and SARA.

The Act codified a prior executive order, No. 89-17.

The second measure, Act No. 590 of 1990, established a limit on all waste buried within the state.[8] The limit reduces the existing statutory authorization for hazardous waste disposal by burial from 135,000 tons within the state in a year to 120,000 tons from July 1, 1990 to July 1, 1991. After July 1, 1991, the authorization drops to 110,000 tons per year. The limit on waste burial can be lifted, however, upon certification that the burial of more waste is necessary to protect the health and safety of the citizens of South Carolina or that 110,000 tons of the waste buried in South Carolina during the relevant time period was generated in South Carolina only.

The same Act also discriminates between waste generated in-state versus out-of-state by establishing a floor for in-state wastes and a ceiling for out-of-state wastes. All hazardous waste facilities must reserve for waste generated in-state at least the same capacity used during the previous year. On the other hand, no more hazardous waste may be buried from out-of-state than the amount buried in the previous year.

The third measure, executive order No. 89-25, promulgated on July 6, 1989, imposes quota preferences for in-state wastes. It requires in-state facilities to reserve at least 54,000 tons per year of the then-current statutory maximum of 135,000 tons for waste generated within South Carolina. It also limits the waste generated from any one state to 35,000 tons per year, and 10,000 tons per quarter.

The fourth and final measure, DHEC Regulation 61-99, effective January 12, 1990, imposes a needs requirement for all permits to establish or expand hazardous waste treatment and storage facilities. Need may be demonstrated by reference to only in-state need.

_____

[8] The limit is most often referred to as a cap. We have used the term "limit" here in order to prevent confusion between "cap" and the acronym for Capacity Assurance Plan, "CAP."

9

D. EPA's Response

In 1985, EPA approved South Carolina's hazardous waste program under RCRA despite the presence of a discriminatory fee imposed on waste generated out of state. 50 Fed.Reg. 46437 (1985); HWTC, 945 F.2d at 785 & n.2.[9] In 1989, EPA expressed concern that the blacklisting provision (Act No. 196 and Exec. Order No. 89-17) could render South Carolina's hazardous waste management program inconsistent with RCRA. Thus, the EPA requested an opinion from the South Carolina Attorney General and certification by the state that the provision was consistent with RCRA. The South Carolina Attorney General responded with an opinion that the provision was "consistent." The record contains no response by EPA or further EPA action.

Shortly thereafter, on October 17, 1989, South Carolina submitted to EPA its proposed CAP. EPA approved the CAP in May 1990, with certain conditions. That approval was granted in the context of an EPA policy of using the CAP process as its first step in addressing state actions which may be inconsistent with RCRA. [10]

Subsequently, in 1995, EPA issued a notice that it had made a final decision, subject to public review and comment, that the agency intended to find that South Carolina's hazardous waste program revisions satisfied all of the requirements necessary for final authorization under RCRA. 60 Fed.Reg. 42046 (Aug. 15, 1995). While the notice does not directly address the provisions at issue here, the notice does indicate that the EPA continues to approve South Carolina's hazardous waste program under RCRA.[11]

_____

[9] That fee is not challenged in the instant lawsuit.

[10] Memorandum from Lee M. Thomas to Regional Administrators, "Policy Regarding Hazardous Waste Management Capacity and RCRA Consistency Issues" (December 23, 1988).

[11] At oral argument, South Carolina asserted that the EPA 1995 RCRA approval specifically addressed one of the challenged provisions at 60 Fed.Reg. 42048, checklist item 17E. Checklist item 17E addresses the federal requirement for "location standards for salt domes, salt beds, underground mines and caves." The federal RCRA regulations addressed were promulgated by EPA on July 15, 1985. The state authority to

II

We review the district court's summary judgment ruling under a de novo standard of review. Henson v. Liggett Group, Inc., 61 F.3d 270, 274 (4th Cir. 1995); Jackson v. Kimel, 992 F.2d 1318, 1322 (4th Cir. 1993). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate only where there are no genuine issues of material fact. In conducting our analysis, we review the record in the light most favorable to the nonmoving party.

South Carolina and the intervenors appeal on several grounds. First, South Carolina argues that the district court erred by applying a dormant Commerce Clause analysis because RCRA, CERCLA, and SARA override the dormant Commerce Clause, rendering the Clause inapplicable. Second, South Carolina asserts that even assuming a dormant Commerce Clause analysis applies, there were genuine issues of material fact and, therefore, summary judgment was premature. Third, South Carolina argues that even assuming its laws violate the dormant Commerce Clause, two portions of the laws--the overall limit on in-state waste burial and the needs requirement for new permits--are neutral nondiscriminating provisions and, therefore, should be severed from the invalid provisions and upheld. Finally,

_____

administer the federal requirements is found at South Carolina Code §§ 44-56-30, 44-56-60(a-c), and 44-56-120. We surmise that South Carolina is referring to § 44-45-60 as being specifically authorized by EPA. Act No. 590 amended § 44-45-60 in 1990 to include the overall limit on waste disposed of by land burial, a ceiling on out-of-state waste, and a floor on in-state waste. From the information before the court, however, we do not presume that EPA specifically addressed and authorized the discriminatory provisions in question here, which were enacted in 1990 and not addressed specifically to the location standards for salt domes, salt beds, underground mines and caves. We do not view the EPA finding as to the particular federal regulation governing location standards for salt domes, salt beds, underground mines and caves as specifically addressing and authorizing the overall limit on hazardous waste burial and the ceilings and floors in question. Thus, based upon the record before the court, we disagree with South Carolina's contention that EPA has specifically addressed and authorized some of the challenged provisions.

11

South Carolina argues that the district court should not have ruled on the constitutionality of the laws, but instead referred the entire lawsuit to the EPA under the doctrine of primary jurisdiction. We address each argument in turn.

We caution at the beginning of our discussion that, as we recognized in our previous opinion in this case, "whatever our own view may be about the effectiveness of what Congress or[South Carolina] has done [and the seriousness of the hazardous waste management problem that plagues our nation], we can only apply the law." HWTC, 945 F.2d at 783 (citing National Solid Wastes Management Ass'n v. Alabama Dep't of Envtl. Management, 910 F.2d 713, 715-16 (11th Cir. 1990), as modified upon denial of reh'g, 924 F.2d 1001 (11th Cir. 1991), cert. denied, 501 U.S. 1206 (1991)).

A. The Dormant Commerce Clause

The Commerce Clause provides that "[t]he Congress shall have Power . . . [t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. Although "phrased as a grant of regulatory power to Congress, the Clause has long been understood to have a `negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." Oregon Waste Sys., Inc. v. Department of Envtl. Quality, 511 U.S. ___, ___, 114 S. Ct. 1345, 1349 (1994). Thus, with certain exceptions, the negative or dormant Commerce Clause prohibits states from discriminating against the free flow of interstate commerce.[12]

Where Congress has acted in an area specifically authorizing state or local government action, the dormant Commerce Clause is, however, inapplicable, even if the state action interferes with interstate commerce. Northeast Bancorp, Inc. v. Board of Governors of the Fed. Reserve Sys., 472 U.S. 159, 174 (1985); White v. Massachusetts Council of Constr. Employers, Inc., 460 U.S. 204, 213 (1983). South Carolina contends that through enacting RCRA, CERCLA, and SARA, Congress created a federal scheme to address the disposal of

_____

[12] The Commerce Clause applies to the interstate flow of hazardous waste. Chemical Waste Management, 504 U.S. at 340 n.3.

hazardous wastes which authorized the state laws challenged here, thus displacing the dormant Commerce Clause.

In order for a state law to be removed from the reach of the dormant Commerce Clause, however, congressional intent to authorize the discriminating law must be either "unmistakably clear" or "expressly stated." South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 91-92 (1984). Congress need not state that it intends to override the dormant Commerce Clause, but it must affirmatively have contemplated the otherwise invalid state legislation. Id.

South Carolina contends that Congress did just that on a number of levels. First, South Carolina insists that under RCRA, Congress has expressly authorized any state law or program addressing hazardous wastes which meets EPA's consistency standard of "reasonableness." 40 C.F.R. § 271.4. Second, South Carolina argues that through delegating the authorization of state programs to the EPA under RCRA and CERCLA, Congress created a system of checkpoints for a state's hazardous waste program. South Carolina contends that by providing the checkpoints, Congress has "affirmatively" authorized the state laws because they are contained in an EPA-approved RCRA program and CAP. See Merrion v. Jicarilla Apache Tribe , 455 U.S. 130, 155 (1982). Finally, South Carolina argues that the CAP requirement affirmatively contemplates and sanctions states discriminating against other states' wastes. Regional agreements, South Carolina asserts, will require that states set aside capacity for states party to the agreement, thus necessitating discrimination among the states. Furthermore, South Carolina contends it must favor its own wastes in order to assure the capacity for in-state wastes it has demonstrated in its CAP.

We previously found at the preliminary injunction stage that RCRA, CERCLA, and SARA did not contain any language indicating "an unmistakably clear congressional intent to permit states to burden interstate commerce." HWTC, 945 F.2d at 792. Neither South Carolina, nor the intervenors have come forward with any further persuasive evidence indicating that Congress intended to permit the states,

13

directly or by EPA authorization, to engage in actions otherwise violative of the Commerce Clause. Id.[13]

More specifically, we reject, as we did before, South Carolina's argument that EPA's reasonableness standard should displace a constitutional dormant Commerce Clause analysis. The EPA's position on what constitutes "reasonableness" has changed over time.[14] While EPA may change its position on what "consistency" entails, the Constitution has not changed and, in the absence of a clear Congressional

_____

[13] The Supreme Court has not yet addressed this question. In Chemical Waste Management, Inc. v. Hunt, 504 U.S. 334 (1992), the Supreme Court pretermitted the issue raised by the amici curiae in that case of whether Congress had authorized a discriminatory fee Alabama imposed on out-of-state hazardous wastes disposed of at commercial facilities located in Alabama. Id. at 346 n.9. Applying the dormant Commerce Clause, the Supreme Court held that the discriminatory fee violated the Commerce Clause and declared the law unconstitutional. The Court refused to consider the question of whether the Commerce Clause did not apply at all because that issue had not been a basis for the lower court's decision or briefed and argued by the parties.

[14] EPA has taken seemingly contradictory positions at different times on how it will apply and interpret the consistency requirement. In 1980, EPA adopted the approach taken in a then-recent Supreme Court opinion, City of Philadelphia v. New Jersey, 437 U.S. 617 (1978), which applied the dormant Commerce Clause to strike down state statutes discriminating against out-of-state liquid or solid wastes. The Court's approach rested on the premise that state regulations which discriminated facially, in effect or in purpose, were virtually per se invalid. City of Philadelphia, 437 U.S. at 624-27. Following that precedent, EPA pronounced that under its consistency regulation, § 271.4, any state program which "operates as a ban on the interstate movement of hazardous waste is automatically inconsistent." HWTC, 945 F.2d at 793 (citing 45 Fed.Reg. 53395 (1980)).

In 1985, EPA "altered" its approach to the consistency requirement. That year, EPA ruled that under its consistency regulation, the agency would apply a "reasonableness" test to interstate commerce restrictions. HWTC, 945 F.2d at 794 (citing 50 Fed.Reg. 46439 (1985)). Thus, EPA announced that it did "not agree that any disparity in treatment between in-state and out-of-state wastes is per se unreasonable" seemingly abandoning its prior constitutional standard. Id.

14

statement authorizing discrimination by the states with respect to hazardous wastes, we must apply the Constitution's dictates. See C & A Carbone, 511 U.S. at \_\_\_, 114 S. Ct. at 1691-92 (O'Connor, J. concurring) (emphasizing high degree of specificity with which Congress must "explicitly" authorize state law otherwise violating the Commerce Clause).**15**

We also find that Congress has not provided a series of checkpoints which authorize discrimination by South Carolina against other states' hazardous wastes. South Carolina relies on Merrion v. Jicarilla Apache Tribe, 455 U.S. 130 (1982), for the proposition that a series of congressionally created checkpoints for a state's law authorizes the

_____

**15** The instant case is distinguishable from the opinion on which South Carolina places a great deal of reliance, White v. Massachusetts Council of Constr. Employers, 460 U.S. 204 (1983), for its proposition that Congress has authorized the State's laws through RCRA and CERCLA. In White, the Mayor of Boston, Massachusetts issued an executive order requiring all construction projects funded by the city to be performed by workers at least half of whom were bona fide residents of Boston. The order was challenged as violating the Commerce Clause. The Supreme Court upheld the Mayor's order, finding that Boston acted as a market participant in spending the city's money. There is a well-settled exception to the dormant Commerce Clause for states or cities acting as market participants as opposed to government regulators of the market. Id. at 206-08. Additionally, the Court noted that although federal funds were also implicated, Congress had specifically contemplated and directed that those funds be used in a similar manner to the city's money: to stimulate economic recovery; to create permanent jobs; to retain jobs that would be lost; to provide jobs to lower income persons and minorities, including the unemployed; and to retrain workers. See, e.g., 42 U.S.C. §§ 3131, 5318. Furthermore, the regulations implementing Congress's directives contained similar mandates, affirmatively permitting the type of parochial favoritism contained in the Mayor's executive order. White, 460 U.S. at 213-14 n.11. Thus, the preference for local employment had been expressly contemplated and authorized by Congress. In contrast, here, Congress merely contemplated that state RCRA programs be consistent with the federal and other states' approved programs. Congress did not contemplate nor direct that state RCRA programs implement economic barriers to hazardous waste from other states. Nor do the EPA's regulations affirmatively and expressly authorize economic barriers to the interstate movement of hazardous wastes.

15

state to discriminate against interstate commerce. The facts of Merrion, however, are distinguishable.

In Merrion, the Court upheld, in the face of a Commerce Clause challenge, a tax imposed by the Jicarilla Apache Indian Tribe on oil and gas extracted from tribal reservation land. The Court found that the Tribe had the power as an independent sovereignty to impose the tax. Id. at 136-52. The Court also noted that the tax would survive dormant Commerce Clause scrutiny, if applied, because Congress had displaced the Commerce Clause by providing a series of precise federal checkpoints that must be cleared before such a tax could be implemented. Id. at 154-56. Congress required that under the Indian Reorganization Act, 25 U.S.C. §§ 476, 477, "a tribe . . . obtain approval from the Secretary [of the Interior] before it adopts or revises its constitution to announce its intention to tax nonmembers." Id. at 155. Congress was also aware that Indian tribes impose taxes of the sort in question. Id. at 156. Furthermore, the tax had been expressly approved by the Secretary through the checkpoints established for such taxes. Id. at 155-56. Thus, Congress expressly authorized such taxes being implemented by Indian Tribes if approved by the Secretary of the Interior.[16]

In contrast, here, one cannot say that Congress expressly contemplated or authorized violations of the dormant Commerce Clause by states limiting access to their hazardous waste facilities when it enacted RCRA, CERCLA, and SARA. Thus, no congressionally established "checkpoints" expressly anticipate or authorize the challenged state laws. Furthermore, the EPA has not expressly approved any of the contested South Carolina laws.[17]

_____

[16] The Court further concluded that the tax would survive Commerce Clause scrutiny because it did not discriminate against interstate commerce in violation of the Commerce Clause. Merrion, 455 U.S. at 156-58. The tax had a substantial nexus with the taxing Tribe, was fairly apportioned, related to the services provided by the Tribe, and was non-discriminatory because it was imposed on minerals sold on the reservation and minerals transported off the reservation before sale. Id.

[17] Even if EPA had expressly approved the laws in question, we could not do so without express congressional authorization.

16

We also reject South Carolina's argument that the CAPs requirement contemplates and requires that South Carolina discriminate against out-of-state waste in order to assure capacity for its in-state waste and to fulfill its interregional agreements. In our prior opinion, HWTC, 945 F.2d at 794-95, we stated that CERCLA requires only

> an "assurance" of twenty-year availability of arranged adequate capacity. It does not [require] that the state must ensure that hazardous waste actually is treated and disposed of either in-state or pursuant to an interstate or regional agreement. CERCLA § 104(c)(9) contemplates that adequate national capacity will exist if each state can assure that it has adequate capacity for in-state generated waste after taking into consideration out-of-state waste that it has agreed to import and in-state waste that it has agreed to export. However, no part of § 104(c)(9) appears to permit or require a state to limit its actual in-state capacity to in-state waste to receive Superfund money. See OSWER Directive 9010.00a at 4, 6. In fact, it appears that, if a state refuses to build in-state facilities or make alternate arrangements, it will be denied Superfund money, even if, in reality, all in-state generated waste is safely exported. If congressional intent had been to subject citizens of recalcitrant states to environmental danger by barring export of otherwise untreated and undisposed of hazardous waste, it could have been easily made clear: "A state not in compliance with this section may not export any waste." In the absence of such intent, we suspect that Congress believed the penalty of no access to federal Superfunds for waste cleanup would be sufficient.

South Carolina has not presented any evidence sufficient to dissuade us of our prior thinking. Furthermore, as the Eleventh Circuit noted in response to a similar argument, if the state's CAP depends on capacity provided by a commercial, privately owned management facility, the state can contract with that private facility for that capacity, instead of blocking the private facility from accepting wastes from other states. National Solid Wastes Management Ass'n, 910 F.2d at 720-21 (rejecting similar argument that SARA expressly authorized state law discriminating against out-of-state hazardous waste);

17

Alabama v. EPA, 871 F.2d 1548, 1555 n.3 (11th Cir.) (finding that Congress had not overridden Commerce Clause through enacting CERCLA), cert. denied, 493 U.S. 991 (1989). Thus, we apply a dormant Commerce Clause analysis to South Carolina's laws.

B. Application of Dormant Commerce Clause

We apply a two-tiered analysis to state actions allegedly violating the dormant Commerce Clause. The first tier, "a virtually per se rule of invalidity," applies where a state law discriminates facially, in its practical effect, or in its purpose. Wyoming v. Oklahoma, 502 U.S. 437, 454-55 (1992) (quoting City of Philadelphia , 437 U.S. at 624). In order for a law to survive such scrutiny, the state must prove that the discriminatory law "is demonstrably justified by a valid factor unrelated to economic protectionism," New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 274 (1988), and that there are no "nondiscriminatory alternatives adequate to preserve the local interests at stake," Hunt, 504 U.S. at 342 (quoting Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 353 (1977)). To date, the Supreme Court has upheld such discriminatory laws only where the discrimination was justified by the threat of death or disease. See, e.g., Maine v. Taylor, 477 U.S. 131 (1986) (upholding Maine's prohibition on importing live baitfish because of the potential for destruction of Maine's fisheries); Clason v. Indiana, 306 U.S. 439 (1939) (upholding Indiana's restrictions on transporting dead animals without a license because of the potential for disease).

The second tier applies if a statute regulates evenhandedly and only indirectly affects interstate commerce. In that case, the law is valid unless the burdens on commerce are "clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).

The line between the per se rule and the Pike balancing test is not clear. Nonetheless, most of the provisions at issue here are not close calls--they clearly discriminate against out-of-state waste either facially, in effect, or in purpose. The blacklisting provision, floor for in-state wastes, ceiling for out-of-state wastes, and quotas for out-of state and in-state wastes facially discriminate against out-of-state wastes by refusing admittance into South Carolina of certain wastes

18

and giving express preference over South Carolina capacity to in-state wastes. Their effect, if implemented, would also clearly discriminate against out-of-state wastes. As for purpose, we have no reason to reverse the district court's finding that the laws in question constitute "an integrated and interconnected discriminatory program," ETC, 901 F. Supp. at 1029, whereby South Carolina has"attempted `to isolate itself from a problem common to [the nation] by erecting a barrier against the movement of interstate trade'," HWTC, 945 F.2d at 791 (quoting City of Philadelphia, 437 U.S. at 628).[18]

A state cannot achieve a legitimate economic goal through "the illegitimate means of isolating the State from the national economy." Wyoming, 502 U.S. at 456-57 (quoting City of Philadelphia, 437 U.S. at 627). The relevant economic unit is the nation, and the Commerce Clause prohibits states from balkanizing into separate economic units. H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 537-38 (1949). Thus, South Carolina faces a heavy burden in justifying its discriminatory practices. To survive summary judgment, South Carolina must demonstrate issues of fact regarding whether the laws are justified by a valid factor unrelated to economic protectionism and, if so, that there are no neutral alternatives available.

While South Carolina failed to articulate precisely its purpose in discriminating against out-of-state waste, the district court found several motivating concerns. The district court first found that South Carolina was motivated by the state's concern for the"health, safety, and welfare of its citizens." ETC, 901 F. Supp. at 1033-34. There is "no basis to distinguish out-of-state waste from domestic waste" over concern for citizens' health, safety, and welfare, however. Hazardous waste is equally dangerous whether generated within South Carolina or out-of-state. See Chemical Waste Management , 504 U.S. at 344-45 (holding that hazardous waste's danger to the health and safety of Alabama's citizens "does not vary with the point of origin of the waste"); HWTC, 945 F.2d at 792 (citing City of Philadelphia, 437 U.S. at 629).

_____

[18] For example, the stated purpose of Act No. 196 (blacklisting provision) is to "give preference to hazardous waste generators within" South Carolina. Act No. 590 gives the same preference to hazardous waste generators within the state.

19

The State's second concern was with preserving existing disposal capacity for waste generated within South Carolina. ETC, 901 F. Supp. at 1034. Natural resources, however, may not be hoarded under the Commerce Clause. "[A] State may not accord its own inhabitants a preferred right of access over consumers in other States to natural resources located within its borders." City of Philadelphia, 437 U.S. at 627; see also New England Power Co. v. New Hampshire, 455 U.S. 331, 338 (1982). Thus, "[t]he burden. . . of conserving the State's remaining landfill space should not fall disproportionately on out-of-state interests." HWTC, 945 F.2d at 792 (citing City of Philadelphia, 437 U.S. at 628).

The third concern the district court found was South Carolina's worries about "transportation risks." ETC , 901 F. Supp. at 1034. Just as with the State's concern with health and safety, there is little to distinguish out-of-state waste from in-state waste in this regard. Furthermore, neutral alternatives exist for regulating transportation of all hazardous waste regardless of origin. Chemical Waste Management, 504 U.S. at 345-46.

Finally, there was South Carolina's concern that it is shouldering an unfair burden of the nation's hazardous wastes. ETC, 901 F. Supp. at 1034. The Commerce Clause does not purport to require fairness among the states in interstate commerce. The "apparent Congressional intent of RCRA and SARA would seem" to be "that hazardous waste be treated and disposed of somewhere, even if spread disproportionately among the states." HWTC, 945 F.2d at 792.

On appeal, South Carolina reframes its purposes as: (1) complying with the CAP by guaranteeing capacity; and (2) addressing "orphan" wastes--hazardous waste from a state which prohibits its disposal and has failed to enter into a CAP for its disposal. As previously explained, the CAP requirement does not require or contemplate that a state discriminate against out-of-state waste in order to comply. Nor does the Commerce Clause allow states to punish other states for not disposing of their wastes through a CAP or otherwise. That task is left exclusively to Congress.

In briefing its appeal, South Carolina pointed to no specific issue of fact as to any potential purpose for discriminating against out-of-

20

state waste. Rather, the State merely argued that it is entitled to present evidence that it has no alternative but to differentiate among out-of-state wastes to protect its citizens' health and safety and to comply with CERCLA.

At the summary judgment stage, South Carolina has a burden to demonstrate disputed issues of material fact. South Carolina has failed to meet its burden. None of the affidavits South Carolina submitted even purport to justify South Carolina's discriminatory treatment of out-of-state wastes. ETC, 901 F. Supp. at 1030.[19] Nor do any of the affidavits purport to demonstrate that no neutral alternatives exist to discrimination.

C. Limit on Waste Buried In-State and Needs Requirement

As for two portions of the South Carolina laws, it is not so obvious, however, that they discriminate either facially, in effect, or in purpose, such that the per se test applies. South Carolina therefore argues that even if we find that the dormant Commerce Clause applies and that the laws are invalid, portions of the laws--the overall limit imposed by Act No. 590 and the needs requirement imposed by DHEC regulation 61-99--do not discriminate against interstate commerce. Therefore, South Carolina contends, the valid portions should be severed from the invalid portions and remain in effect. We disagree.

1. Limit

An evenhanded cap or limit uniformly burdens both in-state and out-of-state interests. See, e.g., Chambers Medical Technologies of S.C. v. Bryant, 52 F.3d 1252, 1258 (4th Cir. 1995). Thus, the Supreme Court has held that the dormant Commerce Clause allows a state to impose "an evenhanded cap on the total tonnage landfilled" with hazardous waste when it "curtail[s] volume from all sources." Chemical Waste Management, 504 U.S. at 345. South Carolina contends that its reduction of the statutory authorization of 135,000 tons per year to

_____

[19] South Carolina merely presents a series of affidavits that describe its hazardous waste program; the amount of wastes buried in state, broken down by in-state and out-of-state wastes; and similar statistics.

21

120,000 tons and then 110,000 tons is an evenhanded neutral limit that does not burden interstate commerce any more than intrastate commerce.[20]

The limit South Carolina seeks to have upheld, however, is not as evenhanded and neutral as the state would have the court believe. The limit does not have the same effect on in-state as out-of-state wastes because the limit can be lifted upon certification that it is necessary to protect South Carolina's citizens, S.C. Code Ann.§ 44-56-60(a)(3)(A) (Law Co-op Supp. 1995), or that the entire statutory authorization of buried waste during the relevant 12-month period was generated in South Carolina, S.C. Code Ann.§ 44-56-60(a)(3)(B) (Law Co-op Supp. 1995). The same exceptions are not granted to out-of-state interests. The Supreme Court has declared that "[t]he commerce clause forbids discrimination, whether forthright or ingenious. In each case it is our duty to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimination against interstate commerce." West Lynn Creamery, Inc. v. Healy, 511 U.S. ___, ___, 114 S. Ct. 2205, 2215-16 (1994) (citing Best & Co. v. Maxwell, 311 U.S. 454, 455-56 (1940); Maryland v. Louisiana, 451 U.S. 725, 756 (1981); Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 147 (1978)). Here, the exception favors in-state interests over out-of-state interests. Thus, the overall limit is not facially neutral, but rather discriminatory and, therefore, subject to the same per se test applied to the other discriminatory provisions of Act 590. The limit fails to survive such scrutiny for the same reasons that the floors and ceilings in Act 590 failed.[21]

_____

[20] South Carolina also contends that we expressly excluded the overall limit as one of the items properly enjoined in our previous opinion addressing the preliminary injunction. HWTC, 945 F.2d at 787 n.9. While we referenced the statutory section containing the limit in our list of sections to be enjoined, we specifically referred to another subsection. Today, however, for the reasons set forth below, we clarify that the limit is included as one of the items that violates the Commerce Clause.

[21] Even if the limit were nondiscriminatory, it would not be severable. State law governs the severability of a state statute. Muller v. Curran, 889 F.2d 54, 57 (4th Cir. 1989), cert. denied , 493 U.S. 1074 (1990). Thus, in determining whether the overall limit can be severed, we turn to South Carolina law. Under South Carolina law,"[t]he test for sever-

22

2. Needs Requirement

The needs regulation requires that a permit application for new or expanded hazardous waste facilities demonstrate need by reference to the level of waste generated in South Carolina only. South Carolina contends that the needs requirement is neutral, functioning similarly to an evenhanded cap and therefore valid. In our earlier opinion, we found that "[o]n its face [the needs requirement] appears not to regulate evenhandedly. It permits South Carolina to refuse to allow new construction if all of its waste can be disposed of by exportation. The `practical effect' . . . of the regulation may be to favor in-state interests over out-of-state interests." HWTC, 945 F.2d at 791 n.14 (citation omitted). Indeed, currently, the practical effect may be to establish a ban on building new capacity.

We find that the needs requirement is not similar to an evenhanded cap with the same effect on both in-state and out-of-state interests. The effect on out-of-state interests is to prohibit facilities from expanding to meet out-of-state needs, but to allow expansion to meet in-state needs. Thus, just as with the overall limit in question, the needs requirement contains an exception for in-state needs allowing expansion or a raise in the limit where in-state needs dictate such a

_____

ability is whether the constitutional portion of the statute remains `complete in itself, wholly independent of that which is rejected, and is of such a character as that it may fairly be presumed that the Legislature would have passed it independent of that which is in conflict with the Constitution.'" Thayer v. South Carolina Tax Comm'n, 413 S.E.2d 810, 814-15 (S.C. 1992) (citing Shumpert v. South Carolina Dep't of Highways & Public Transp., 409 S.E.2d 771 (1991)) (footnote omitted).

We cannot fairly presume that the South Carolina legislature would have passed the overall limit without the provision allowing the limit's increase if South Carolina wastes exceeded the cap. Nor can we assume that the limit would have been passed without the remaining provisions of the statute, which include floors for in-state-wastes and ceilings for out-of-state wastes. By protecting capacity for in-state interests, the legislature may have quelched in-state political interests that might otherwise have lobbied against the overall limit. Thus, we conclude that the limit provision is not severable.

23

rise. While the limit once imposed applies equally to out-of-state and in-state wastes, in effect, it guarantees in-state generators of waste space because the limit can always be raised in order to meet in-state needs.

Therefore, we apply the per se test to Regulation 61-99.**22** The needs regulation does not survive the per se test for the same reasons the remainder of the challenged South Carolina laws failed to survive. South Carolina has raised no issue of fact as to a state rationale unrelated to the origin of the waste for its needs requirement.

D. Primary Jurisdiction

Finally, South Carolina attempts to persuade us that the district court erred by failing to defer under the doctrine of primary jurisdiction to the EPA in the first instance as to whether South Carolina's laws are constitutional.**23** "No fixed formula exists for applying the

_____

**22** South Carolina's reliance on Chambers Medical Technologies of South Carolina v. Bryant, 52 F.3d 1252 (4th Cir. 1995), does not aid its cause. South Carolina seeks to establish that the needs regulation is similar to South Carolina's fluctuating cap for infectious waste based on the amount of waste generated in South Carolina alone. In Chambers, we held that the fluctuating cap for infectious waste might pass Commerce Clause scrutiny if it regulated in an evenhanded fashion and had only incidental effects on interstate commerce; whereas it would not be constitutional if it discriminated facially, in effect, or in purpose, thus necessitating that the per se test be applied. Id. at 1262. Here, the regulation discriminates in effect. Thus, the per se test applies.

Furthermore, significantly, we noted that the fluctuating cap in Chambers did not operate as a ban on the expansion of facilities. 52 F.3d at 1262. It merely limited the amount of infectious waste any one facility could process. While the South Carolina Code required that a permit be obtained in order to build a new facility and that infectious waste generated out-of-state could only be considered in the needs calculations with DHEC approval, the Chambers court assumed that the DHEC would not deny a permit on a basis violating the Commerce Clause. Id. at 1262 n.15. Thus, in dicta, we suggested in Chambers that outright bans on expansion based on in-state needs only will most likely not survive dormant Commerce Clause scrutiny.

**23** As conceded in oral argument, however, South Carolina has not requested that the EPA intervene in this case as an amicus curiae, nor has the EPA sought intervention.

24

doctrine of primary jurisdiction." United States v. Western Pac. R.R. Co., 352 U.S. 59, 64 (1956). Generally speaking, the doctrine is designed to coordinate administrative and judicial decision-making by taking advantage of agency expertise and referring issues of fact not within the conventional experience of judges or cases which require the exercise of administrative discretion. Id. ; Commonwealth of Massachusetts v. Blackstone Valley Elec. Co., 67 F.3d 981, 992 (1st Cir. 1995); Mashpee Tribe v. New Seabury Corp., 592 F.2d 575, 580 (1st Cir.), cert. denied, 444 U.S. 866 (1979), and cert. denied, 464 U.S. 866 (1983).

The district judge refused to refer the instant lawsuit to the EPA under the doctrine of primary jurisdiction because he found that there were no issues of fact. Primary jurisdiction, he held, applied only to the referral of factual, not legal, issues. He further reasoned that the "constitutional issues . . . [at stake were more] properly within the traditional purview of an Article III court, and are not those to which EPA could conceivably lend some degree of expertise." ETC, 901 F. Supp. at 1029. We review the district court's decision declining to refer the lawsuit to the EPA under the doctrine of primary jurisdiction for abuse of discretion. In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1162 (3d Cir. 1993), cert. denied, 114 S. Ct. 921 (1994).**24**

The district court did not abuse its discretion. The EPA's special

_____

**24** South Carolina contends that the district court's refusal to apply the doctrine of primary jurisdiction was based wholly on erroneous conclusions of laws and should therefore be reviewed de novo. "[D]espite what the term [primary jurisdiction] may imply,[it] does not speak to the jurisdictional power of the federal courts. It simply structures the proceedings as a matter of judicial discretion, so as to engender an orderly and sensible coordination of the work of agencies and courts." In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d at 1162 (quoting United States v. Bessemer & Lake Erie R.R. Co., 717 F.2d 593, 599 (D.C. Cir. 1983)). Thus, the decision not to refer a lawsuit to an agency under the doctrine of primary jurisdiction is a discretionary matter which we review for abuse of discretion. Furthermore, because the matter at issue is a constitutional question which lies within this court's expertise, the district court correctly applied the law.

25

expertise is not needed to decide a question of law in a constitutional matter.

Accordingly, the district court's judgment is

AFFIRMED.

26