**WASTE MANAGEMENT HOLDINGS, et al., Plaintiffs,**

v.

**James S. GILMORE, acting in his official capacity as the Governor of the Commonwealth of Virginia, et al., Defendants.**

**No. Civ.A. 3:99CV425.**

United States District Court,
E.D. Virginia,
Richmond Division.

Feb. 2, 2000.

Robert Lawrence Bronston, Mayer, Brown & Platt, Washington, DC, Kenneth S. Geller, Evan M. Tager, Mayer, Brown & Platt, Washington, DC, for Waste Management Holdings, Inc., plaintiff.

Shawn Alan Copeland, Hunton & Williams, Richmond, VA, John Early Holloway, Hunton & Williams, Norfolk, VA, for Hale Intermodal Marine Company, plaintiff.

Anthony F. Troy, Mays & Valentine, Richmond, VA, James S. Crockett, Jr., Mays & Valentine, Richmond, VA, for Weanack Land Limited Partners, plaintiff.

B. Randolph Boyd, Randolph, Boyd, Cherry & Vaughn, Richmond, VA, for Charles City County, plaintiff.

Shawn Alan Copeland, Hunton & Williams, Richmond, VA, David Alan Rudlin, Hunton & Williams, Richmond, VA, Timothy George Hayes, Hunton & Williams, Richmond, VA, Meade Addison Spotts, Spotts, Smith, Fain, Buis, PC., Richmond, VA, Jason S. Thomas, Hunton & Williams, Raleigh, NC, for Brunswick Waste Management Facility, L.L.C., consolidated plaintiff.

Deborah Love Feild, Office Of The Attorney General, Richmond, VA, Ellen Firsching Brown, Attorney General of Virginia, Richmond, VA, Stewart Todd Leeth, Assistant Attorney General, Richmond, VA, William Eugene Thro, Christopher Newport University, Newport News, VA, for James S. Gilmore, III, in his official

capacity as Governor of the Commonwealth of Virginia, John Paul Woodley, Jr., in his official capacity as Secretary of Natural Resources, Dennis Treacy, Jr., in his official capacity as Director of the Virginia Department of Environmental Quality, defendants.

Glen Besa, Richmond, VA, for Glen Besa, movant pro se.

David Sanburg Bailey, Beaverdam, VA, for Campaign Virginia, movant.

Clayton Lewis Walton, Williams, Mullen, Clark & Dobbins, Richmond, VA, Barbara Joan Gaden, Barbara J. Gaden, LLC, Richmond, VA, Stewart Todd Leeth, Assistant Attorney General, Richmond, VA, for John H. Hager, Honorable, Emily Couric, Senator, Margaret Whipple, Senator, Bruce Jamerson, Mark A. Miner, Lila Young, movants.

Meade Addison Spotts, Spotts, Smith, Fain, Buis, PC, Richmond, VA, Hugh McCoy Fain, III, Spotts, Smith, Fain & Buis, P.C., Richmond, VA, for The National Solid Wastes Management Association, amicus.

Meade Addison Spotts, Hugh McCoy Fain, III, Spotts, Smith, Fain & Buis, P.C., Richmond, VA, John H. Turner, BFI Waste Systems of North America, Inc., Houston, TX, for BFI Waste Systems of North America, Inc., amicus.

## MEMORANDUM OPINION

SPENCER, District Judge.

THIS MATTER is before the Court on a Motion for Partial Summary Judgment brought by Defendants JAMES S. GILMORE, ET AL (herein collectively "Virginia") and a Motion for Summary Judgment brought by Plaintiffs WASTE MANAGEMENT HOLDINGS, ET AL (herein collectively "Plaintiffs"). For the reasons stated below.

1. Virginia's Motion for Partial Summary Judgment is DENIED.

2. Plaintiffs' Motion for Summary Judgment is GRANTED.

## I. Background

This case arises from the enactment of several state statutes that purport to curtail the importation of municipal solid waste (herein "MSW") into Virginia. These statutes have been challenged by five plaintiffs (herein collectively "Plaintiffs"): (1) Waste Management Holdings, Inc. (herein "Waste Management"), whose affiliates operate several large landfills in Virginia that accept substantial quantities of out-of-state MSW; (2) Weanack Land Limited Partners (herein "Weanack"), which owns a transfer facility on the James River where containerized shipments of MSW are offloaded from barges and onto tractor trailers; (3) Hale Intermodal Marine Company (herein "Hale"), a barging company that transports, among other things, containerized MSW; (4) Charles City County, which owns property that it leases to Waste Management for use as a landfill; and (5) Brunswick Waste Management Facility, L.L.C. (herein "Brunswick"), which owns and operates a large landfill in Brunswick County, Virginia. The defendants are James S. Gilmore, III, in his official capacity as Governor of the Commonwealth; John Woodley, in his official capacity as Secretary of Natural Resources; and Dennis Treacy, in his official capacity as Director of the Virginia Department of Environmental Quality (herein collectively "Virginia.").

Plaintiffs contend that the disputed statutes violate the Commerce, Contracts, Supremacy, and Equal Protection Clauses of the United States Constitution, although only the Commerce and Supremacy Clauses are asserted in these particular motions. Plaintiffs maintain that these statutes were adopted by Virginia in response to reports that major importers and handlers MSW planned to increase the daily amount of MSW flowing into Virginia landfills. Plaintiffs therefore characterize these statutes as blatant, unconstitutional attempts to hinder interstate commerce by placing importers and handlers of out-of-state MSW at an extreme disadvantage in rela-

tion to importers and handlers of Virginia-generated MSW. Virginia counters that these statutes were adopted as a legitimate exercise of its police powers, for the protection of public health and to conserve Virginia resources (including landfill space).[1]

### A. MSW in Virginia

The Virginia Department of Environmental Quality (herein the "DEQ") reports that as of November 1998, there were 70 active landfills in Virginia that accepted MSW. (Waste Management App. to Reb. Mem. 2 at 23.) Although the parties disagree over how many of those landfills accept MSW from other states, this much is clear: Seven "regional" landfills account for 97% of the out-of-state waste deposited in Virginia. Approximately 61 "local" landfills accept no out-of-state waste at all. The regional landfills, which are privately operated and have substantially greater disposal capacity than their local counterparts, have been sited and constructed over the past decade in order to comply with strict state and federal regulations.[2] Pursuant to a "host agreement" with the county in which it is located, each regional landfill pays the host county a fee based upon the volume of waste (excluding the host's waste) deposited at that location.[3] These agreements also require the regional landfills to perform certain services for their host communities, such as providing free waste disposal and recycling services and/or funding the closing of any local landfills which do not meet state and federal regulations. The construction of these regional landfills has required tens

of millions of dollars in private investment, and the landfills face high operation and maintenance costs in addition to the sizable "host fees." To meet their revenue needs and remain economically viable, each regional landfill relies heavily on the disposal of out-of-state MSW. (Wilson Decl. ¶¶ 7–9.) In fact, out-of-state MSW comprises 75% of the MSW accepted at the five regional landfills operated by Waste Management[4] (DEQ Report at 32) and almost 100% of the waste accepted at Brunswick's regional landfill. (Burrier Aff., Brunswick Exh. 1, ¶ 15.)

Under its host agreements, Waste Management is permitted to dispose of over 2,000 tons of MSW per day at all but one of its regional landfills; prior to the enactment of the disputed statutes, Waste Management expected to exceed that level in 1999. It further expected that three of its five regional landfills would accept substantially more waste in 1999 than they had in 1998. The Charles City County Landfill, for instance, accepted approximately 2,849 tons of MSW per day in 1999, compared to less than 2,000 tons per day in 1998. (Wilson Decl. ¶¶ 11, 13–15.) Likewise, Brunswick accepted approximately 2,400 tons per day in 1998, and accepted more than 2,800 tons per day in 1999. Before the enactment of the disputed statutes, it had expected to reach 5,000 tons per day by the end of the year 2000. (Burrier Aff. ¶¶ 10–11.) By contrast, not one of the sixty-one Virginia landfills that accept only Virginia-generated MSW has ever disposed of more than 2,000 tons per day, and only one or two of those might

---

1. While the parties disagree sharply over the danger to persons and to the environment posed by the importation of MSW into Virginia, the true extent of this danger is not dispositive as to the constitutional issues invoked here. Questions of comparative hazard and risk assessment are therefore not discussed.

2. Many of Virginia's local landfills could not comply with those regulations at the time they were enacted.

3. For instance, Waste Management has paid Charles City County almost $37 million in

host fees over the last nine years. (Wilson Decl., Waste Management Exh. 6, ¶ 8.)

4. Waste Management operates the following regional landfills: the Charles City County Landfill; the King George County Landfill and Recycling Facility; the Maplewood Recycling and Waste Disposal Facility, located in Amelia County; the Middle Peninsula Landfill and Recycling Center, located in Gloucester County; and the Atlantic Waste Disposal Landfill in Sussex County. (Wilson Decl. ¶ 5.)

ever be expected to reach that level in the future. (Wilson Decl. ¶ 13.) Indeed, the DEQ has stated that "[m]ost landfills operated by local governments receive less than 100 tons per day; a few receive closer to 500 tons per day." (Waste Management Reb. Mem. to Mot. for Prelim. Inj.App. 15.)

## B. Disposal of MSW Generated by New York City

For several decades, New York City has disposed of its residential MSW at the Fresh Kills Landfill in Staten Island. In 1997, New York Governor George Pataki and New York City Mayor Rudolph Giuliani announced that the Fresh Kills Landfill would cease accepting waste in December 2001. The New York City Department of Sanitation (herein "NYDOS") therefore began to negotiate interim disposal contracts in order to phase out its dependency on the Fresh Kills Landfill. (Cekander Decl., Waste Management Exh. 2, ¶¶ 3–4). Waste Management has been awarded two of those contracts, and much of the MSW handled under those two contracts has been deposited at its regional landfills in Virginia. In March 1999, it bid on a third contract, which also contemplates the disposal of New York-generated MSW in Virginia. (*Id.* ¶¶ 5, 7–8.) More significantly, Waste Management has bid on, and is a primary contender for, a twenty-year contract to dispose of all or part of 12,000 tons of residential waste per day from Manhattan, Queens, Brooklyn, and the Bronx. NYDOS's Request For Proposal expresses a preference that any waste removed under this contract be transported by barge and/or rail, rather than by truck. Waste Management's response contemplates sending 60% of the New York City residential MSW to Virginia landfills, particularly the Charles City Landfill. It also contemplates that most of this waste will be containerized and transported by barge up the James River for offloading at the James River Facility. (*Id.* ¶¶ 10–11.)

In addition to the residential waste covered by existing and pending contracts, Waste Management also removes signifi-cant quantities of *commercial* waste per day from New York City and surrounding communities. (Magrann Decl., Waste Management Exh. 5, ¶ 3.) Waste Management had transported a substantial portion of this waste to Virginia landfills by tractor trailer, but in 1998 began planning to transport much of the waste by barge. In furtherance of this plan, it negotiated a contract with co-plaintiff Hale, whereby Hale would lease to Waste Management four barges for five years at a fixed price, with an option to lease an additional two barges. Each barge is capable of carrying 5,000 tons of waste in specially constructed containers that can be stacked five high. Hale and Waste Management expected that barging would commence in March or April 1999, that Waste Management would transport 2,500 to 3,000 tons of MSW per day from Brooklyn to the James River Facility, and that this waste would then be unloaded and delivered to the Charles City County Landfill for disposal. (*Id.* ¶¶ 5–6.) Toward this end, Waste Management has agreed to purchase 400 American Bureau of Shipping-approved, double steel walled containers at a cost of $10,000 per container. (*Id.* ¶ 8.) It has also invested more than $5 million in improvements at the James River facility and has guaranteed payment on two cranes for offloading containers that together are worth more than $5 million. (Wilson Decl. ¶ 19.)

Except for the small amount of waste generated on Virginia islands (such as Tangier Island) and transported across the Chesapeake Bay, no in-state MSW is transported to Virginia landfills by water.

## C. Political Reaction to Increased Importation of MSW

In June 1998, the DEQ issued a report (herein the "DEQ Report") indicating that, during the fourth quarter of 1997 alone, Virginia had imported 788,000 tons of MSW and that most of it had been disposed of in large commercial facilities. (Waste Management Reb. Mem. to Mot. for Prelim. Inj.App. 2.) Around the same

time, Waste Management's plans to significantly increase its importation of New York City's MSW into Virginia began to attract greater notice. In July 1998, State Senator Bill Bolling, chief sponsor of the disputed statutes, wrote to Virginia Attorney General Mark Early about the possibility of blocking those plans:

> With the impending closure of the Fresh Kills Landfill in New York, I am concerned that the pressure for additional importation will increase even more in the next few years. If it is legally possible to do, I would like to introduce legislation during the 1999 session of the General Assembly that would place restrictions on such importations.
>
> The legislation I am currently considering could take a number of forms. This legislation could seek to prohibit the importation of out-of-state waste altogether. In the alternative, I may seek to limit such importations to those landfills currently receiving out-of-state waste, and to levels reflective of their current importations. However, I do not want to propose such legislation if it would be in violation of federal or state law.

(*Id.* at App. 4.) In August 1998, the Congressional Research Service issued a report indicating that Virginia now ranked second only to Pennsylvania as the nation's largest importer of MSW, taking in 2.8 million tons in 1997. On September 30, 1998, Senator Bolling announced his intention to introduce legislation aimed at out-of-state waste importation when the General Assembly reconvened in January 1999. In support of his proposals, Senator Bolling highlighted the Commonwealth's newly acquired ranking among waste-importing states, Waste Management's recently announced contract to remove 2,400 tons of residential MSW per day from New York City, "[m]ost if not all of [which] will be transported on Virginia's waterways," and the impending closure of the Fresh Kills Landfill. "New York officials have made no secret of their intent to export the 14,000 tons of garbage a day that are currently disposed of in the Fresh Kills Landfill to other states. It appears as though the vast majority of this garbage may be headed to Virginia as well," Senator Bolling warned. (*Id.* at App. 5.)

Governor Gilmore also expressed concern about the increased flow of out-of-state waste into Virginia's landfills. On September 29, 1998, he announced that he was dispatching his top environmental officials to meet with their counterparts from other states "to ensure that Virginia does not drown in a regional sea of garbage." (*Id.* at App. 4.) In November, after the DEQ Report was released, the Governor imposed a moratorium on new landfill development and instructed Secretary Woodley to recommend legislation to deal with the problem. (*Id.* at App. 5.)

In his January 13, 1999 State of the Commonwealth address, Governor Gilmore proposed such legislation. Specifically referring to Waste Management's intentions, he noted that "[j]ust two days ago, a major trash company announced plans to import four thousand more tons of New York City trash into Virginia per day." To combat this increase, he announced that he would ask the Virginia General Assembly to take the following steps: (1) to prohibit the use of barges for transporting MSW on Virginia's waterways; (2) to impose new permit requirements for landfills; (3) to cap the amount of waste that may be deposited in Virginia landfills; and (4) to increase inspections of waste being hauled by truck or other means. (*Id.* at App. 11.) When New York City Mayor Giuliani suggested that Virginia might have an obligation to accept New York City's MSW, Governor Gilmore responded that "the home state of Washington, Jefferson, and Madison has no intention of becoming New York's dumping grounds." (*Id.* at App. 10.)

Meanwhile, numerous Virginia lawmakers and other state officials announced their support for Senator Bolling's and the Governor's efforts, frequently couching their positions in anti-out-of-state MSW terms. (Waste Management App. 13–18.)

## D. The Disputed Statutes

In March and April 1999, the General Assembly approved and Governor Gilmore signed into law a number of amendments to the Code of Virginia that would impede the importation of out-of-state MSW into the Commonwealth.

### 1. *The Cap Provision*

First, the General Assembly capped the amount of waste that any landfill may accept at either (1) 2,000 tons per day or (2) the average amount accepted by the landfill in 1998, whichever is greater. 1999 Virginia Acts chs. 580, 611 (adding § 10.1–1408.3) (herein the "cap provision"). The cap provision also authorizes the Virginia Waste Management Board to grant individual requests for exceptions if, after considering "the potential human health, environmental, transportation infrastructure, and transportation safety impacts and needs," it determines that "(I) [an exception] protects present and future human health and safety and the environment; (ii) there is a need for the additional capacity; (iii) sufficient infrastructure will exist to safely handle the waste flow; (iv) the increase is consistent with the requirements of § 10.1–1408.3 [which establishes the cap]; (v) the public interest will be served by [the increase]; and (vi) the additional capacity is consistent with regional and local solid waste management plans developed to pursuant to § 10.1–1411." *Id.* (incorporating factors set out in amended version of § 10.1–1408.1(D)). In addition to these factors, the Board must also consider "other factors it deems appropriate to protect the health, safety and welfare of the people of Virginia and Virginia's environmental and natural resources." *Id.* The Board may not approve an exception from the cap "until a public hearing on the proposed increase has been held in the locality where the landfill requesting the increase is located." *Id.*

### 2. *The Barging Restrictions*

In addition to the cap provision, the General Assembly enacted two new amendments restricting the use of barges for the transport of MSW on Virginia's waterways (herein collectively the "barging restrictions").

#### a. *The Stacking Provision*

Section 10.1–1454.1(A) of the Code of Virginia, enacted in 1998, requires the Virginia Waste Management Board to promulgate regulations governing the transport of MSW by ship, barge, or other vessel, as well as the loading and unloading of such waste. Va.Code Ann. § 10.1–1454.1(A). Pursuant to the second provision challenged here, those regulations, which have yet to be issued, must require now that containerized waste be stacked no more than two containers high. 1999 Virginia Acts ch. 608 (amending Va.Code § 10.1–1454.1) (herein the "stacking provision"). Under the amended version of Subsection B, "[n]o facility shall receive wastes ... by ship, barge, or other vessel prior to the effective date of the regulations promulgated pursuant to subsection A." *Id.* There is no deadline for the issuance of these regulations.

#### b. *The Three–River Ban*

Finally, the General Assembly added § 10.1–1454.2 to the Virginia Code. This new section prohibits "the commercial transport of hazardous or nonhazardous solid waste by ship barge or other vessel [upon the] Rappahanock, James and York Rivers, to the fullest extent consistent with limitations posed by Constitution of the United States." 1999 Virginia Acts, chs. 583, 612 (adding § 10.1–1454.2) (herein the "three-river ban").

## II. Standard of Review

A motion for summary judgment lies only where "there is no genuine issue as to any material fact" and where the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). The Court must view the facts and the

inferences drawn therefrom in the light most favorable to the party opposing the motion. *Ballinger v. North Carolina Agr. Extension Serv.*, 815 F.2d 1001, 1004 (4th Cir.), *cert. denied*, 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987). While viewing the facts in such a manner, the Court looks to the affidavits or other specific facts to determine whether a triable issue exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). According to the Fourth Circuit,

> In determining whether summary judgment may be granted, the district court must perform a dual inquiry into the *genuineness* and *materiality* of any purported factual issues. Whether an issue is genuine calls for an examination of the entire record then before the court in the form of pleadings, depositions, answers to interrogatories, admissions on file and affidavits, under Rule 56(c) and (e).... Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not publicly suffice. A trial, after all, is not an entitlement. It exists to resolve what reasonable minds would recognize as real factual disputes.

*Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985) (emphasis original). Finally, summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

### III. Analysis

Plaintiffs' Motion for Summary Judgment addresses all of the regulations listed in Section II, whereas Virginia's Motion for Partial Summary Judgment deals only with the cap provision; as one motion essentially subsumes the other, they shall be addressed jointly. For the reasons discussed below, Virginia's Motion for Partial Summary Judgment is DENIED and the Plaintiffs' Motion for Summary Judgment is GRANTED in its entirety.

While the parties have conducted a vigorous factual debate as to the present state of waste disposal in Virginia, whether the disputed statutes may stand is ultimately a question of constitutional law. This question must be answered in favor of the Plaintiffs, in light of well-established and unequivocal precedent concerning the ability of states to affect interstate commerce. The Commerce Clause of the United States Constitution grants Congress "the Power ... to regulate Commerce ... among the several States." U.S. CONST. ART. I, § 8, cl. 3. Although the Commerce Clause is phrased as a delegation of power to Congress, it "has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden" the free flow of commerce across state lines. *Oregon Waste Systems, Inc. v. Dept. of Environmental Quality*, 511 U.S. 93, 98, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994) (internal citations omitted). This limitation on state power reflects the Framers' firm belief that in order for the new Union to succeed, it "would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Id.* (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325–26, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979)).

When a law appears to discriminate against out-of-state interests "facially, in its practical effect, or in its purpose," it will only survive judicial scrutiny if the defendant can show that (1) it "is demonstrably justified by a valid factor unrelated to economic protectionism" and (2) there are "no nondiscriminatory alternatives adequate to preserve the local interests at stake."*Environmental Technology Council v. Sierra Club*, 98 F.3d 774, 785 (4th Cir. 1996) (internal citations omitted). This standard has been characterized as "a virtually per se rule of invalidity," for the Supreme Court has upheld such discriminatory laws only in a few instances where the discrimination was justified by the threat of death or disease. *Id.* (*citing Maine v. Taylor*, 477 U.S. 131, 106 S.Ct.

2440, 91 L.Ed.2d 110 (1986) (upholding Maine's prohibition on importing live bait-fish because they threatened destruction of Maine's fisheries); *Clason v. Indiana*, 306 U.S. 439, 59 S.Ct. 609, 83 L.Ed. 858 (1939) (upholding Indiana's restrictions on transporting dead animals without a license)). A more forgiving standard of review applies, however, "[w]here the statute regulates evenhandedly to effectuate a legitimate public interest, and its effects on interstate commerce are only incidental." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978) (*quoting Pike v. Bruce Church*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)). Specifically, such legislation "will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.* This standard reflects the Court's recognition that "incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people." *Id.* at 623–24, 98 S.Ct. 2531. As the Fourth Circuit has observed, the line between those laws that are subject to strict scrutiny (and thus are presumptively invalid) and those that are subject to the more relaxed standard of review "is not clear." *Environmental Technology Council*, 98 F.3d at 785. "The crucial inquiry," however, is whether the legislation at issue "is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *City of Philadelphia*, 437 U.S. at 624, 98 S.Ct. 2531.

■ As a preliminary matter, the statutes at issue here must be examined under strict scrutiny, because the facts introduced thus far demonstrate that these statutes discriminate facially against out-of-state interests. The Fourth Circuit made clear in its holding in *Environmental Technology Council* that strict scrutiny should be applied where states adopt policies that appear to burden interstate commerce; a finding that such polices actually do so is not required. *Environmental*

*Technology Council*, 98 F.3d at 785. This distinction may seem to be merely semantic, but its impact is critical, both for the Court and for the parties: the Court is required to apply the two-prong test outlined in *Environmental Technology Council* without determining first whether the disputed statutes actually burden interstate commerce. As a consequence, Virginia's arguments as to the true burden—if any—imposed upon interstate commerce by the adoption of the disputed statutes have no bearing upon the level of scrutiny appropriate for this case. The Court could not apply the more lenient standard of review presented in *City of Philadelphia*, even if it were to accept Virginia's contention that interstate commerce would not be burdened by the disputed statutes, because Plaintiffs have demonstrated that the disputed statutes do not regulate evenhandedly on their face. Indeed, Virginia appears to have adopted measures that would frustrate or preclude the importation of MSW at every turn, even if these measures might also hinder the intrastate handling of MSW. For this reason, the disputed statutes must be examined under the two-prong test outlined in *Environmental Technology Council*: Virginia must show that the statutes are (1) "demonstrably justified by a valid factor unrelated to economic protectionism," and also (2) that there are no adequate, nondiscriminatory alternatives that would protect local interests.

■ Regardless of whether Virginia can show that the disputed statutes are justified by a valid factor unrelated to economic protectionism (and the Court finds that doing so is truly impossible), Virginia plainly cannot demonstrate that no adequate, nondiscriminatory alternatives exist that would protect local interests just as well as the disputed statutes. Plaintiffs posit at least two perfectly reasonable alternatives that might also protect Virginia landfill capacity: (1) a cap upon the flow of MSW into all Virginia landfills, not merely the regional landfills used predominantly by out-of-state interests; and (2) an in-

creased user fee for those who deposit MSW into all Virginia landfills, which would give all MSW handlers an economic incentive to minimize waste, not merely those MSW handlers who bring in MSW from outside of Virginia. It is not difficult to think of other alternatives; indeed, when considering the all-river ban in its ruling on Plaintiffs' Motion for Preliminary Injunction, the Court found that Virginia could likely

> address its health, safety, and environmental concerns without totally prohibiting the use of container barges for transporting solid waste. Indeed, the General Assembly approved such legislation in 1998 in the form of Va.Code § 10.1–1454.1. That section requires that solid waste transported by water be carried in containers "designed, constructed, loaded, operated, and maintained so as to prevent the escape of liquids, waste and odors and to prevent the loss or spillage of waste in the event of an accident." § 10.1–1454.1(F). It further requires the Virginia Waste Management Board to promulgate regulations along those lines. § 10.1–1454.1(A). The General Assembly acted to effectively preclude the use of container barges for transporting interstate waste, however, before the Board ever issued its regulations.

(Mem. Op. on Prelim. Inj. § III(D).). Virginia argues that Plaintiffs have offered the Court no reasonable alternatives to the disputed statutes, and thus that Plaintiffs have not satisfied the second prong under *Environmental Technology Council.* Virginia is not merely wrong on the facts, it is also wrong on the law. Plaintiffs have indeed offered some possible alternatives to the disputed statutes, all of which appear perfectly capable of reducing the flow of MSW into Virginia landfills. Plaintiffs needn't have done so, however—it is Virginia's burden to show that no such reasonable alternatives exist, and it has not done so. As Virginia has failed to satisfy the second prong under *Environmental Tech-*

*nology Council,* the disputed statutes cannot survive strict scrutiny; the statutes therefore unconstitutionally interfere with interstate commerce, in violation of the Commerce Clause.

Nor can Virginia show that the disputed statutes are "demonstrably justified by a valid factor unrelated to economic protectionism." *Environmental Technology Council,* 98 F.3d at 785 (internal citations omitted). While Virginia offers numerous factors to justify its adoption of the disputed statute, the Court has already ruled on the relative merit of these factors and found them wanting. In its ruling on the Motion to Dismiss, the Court noted Virginia's professed need

> to preserve landfill capacity and to limit their growth at a reasonable level. The Supreme Court has squarely rejected the notion, however, that "resource protectionism" is a valid defense to a Commerce Clause challenge. *Oregon Waste Systems, supra,* 511 U.S. at 107, 114 S.Ct. at 1354 ("Even assuming that landfill space is a 'natural resource,' 'a State may not accord its own inhabitants a preferred right of access over consumers in other States to natural resources within its borders.'") (*quoting City of Philadelphia,* 437 U.S. at 627, 98 S.Ct. at 2537). The Commonwealth also contends that the laws are justified by Virginia's desire to protect the health and safety of its citizens and the environment. Although these are clearly valid policy concerns, the Supreme Court has made clear that a state may not address those concerns by discriminating against out-of-state waste. *Chemical Waste Management,* 504 U.S. at 345–46, 112 S.Ct. at 2015–16 ("To the extent that Alabama's concern touches environmental conservation and the health and safety of its citizens, such concern does not vary with the point of origin of the waste, and it remains within the State's power to monitor and regulate more closely the transportation of all hazardous waste within its borders.") [5]

**5.** The full citation for this case is *Chemical Waste Management, Inc. v. Hunt,* 504 U.S. 334, 356–46, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992).

(Mem. Op. on Prelim. Inj. § III(C)(3).) The parties argue at length about the nature of Virginia's existing MSW regulations (spending considerable time on the manner in which Virginia regulates various forms of medical waste, which may or may not find its way into the waste stream) as compared to regulations found in other states, but this discussion is ultimately beside the point. Under the law, it doesn't matter whether Virginia's MSW standards (either before or after the disputed statutes were enacted) better protect the environment, public safety, or landfill resources than standards in other states. What matters is that Virginia appears to have buttressed these protections by adopting measures which unduly hinder the importation of MSW. Further, the record demonstrates that Virginia acted to staunch the importation of MSW in a knee-jerk response to reports that increased levels of out-of-state MSW would soon be flowing into the Commonwealth, which— while perhaps advantageous politically, or commendable socially—is impermissible constitutionally. The tenor of public discussion cited in Section II makes clear that Virginia was motivated by economic protectionism, and therefore any post-hoc efforts to shroud its actions in the cloak of environmental conservation and resource preservation are ineffectual. Governor Gilmore's comments are direct: Virginia did not intend to "drown in a sea of regional garbage," and it had "no intention of becoming New York's dumping grounds." Virginia cannot now assume a false mantle of neutrality towards out-of-state MSW, nor can it evade years of established precedent. Virginia therefore fails also to satisfy the first prong under *Environmental Technology Council,* and thus the disputed statutes violate the Commerce Clause.

## IV. Conclusion

For these reasons, Virginia's Motion for Partial Summary Judgment is DENIED and Plaintiffs' Motion for Summary Judgment is GRANTED in its entirety.

And it is SO ORDERED.