44

## CIRCUIT COURT OF THE CITY OF RICHMOND

James River Association

v.

Commonwealth of Virginia,
ex rel. Waste Management Board

February 4, 2005

Case No. CH03-1514-4

BY JUDGE RANDALL G. JOHNSON

This administrative appeal challenges two regulations adopted by the Virginia Waste Management Board on July 25, 2003. Appellant is James River Association ("JRA" or "the Association"), a not-for-profit association incorporated under the laws of the Commonwealth. Appellee is the Commonwealth of Virginia, *ex rel.* Waste Management Board. By order entered February 17, 2004, the court rejected the Commonwealth's challenge to JRA's standing to maintain the appeal, the court holding that, by owning real and personal property along a waterway to which the subject regulations apply, the Association was a "person aggrieved" within the meaning of Va. Code § 10.1-1457(A). The same order allowed Waste Management of Virginia, Inc., and Charles City County, both of whom will be directly affected by the court's decision in the appeal, to intervene on the side of the Commonwealth.

The first regulation at issue is 9 Va. Admin. Code § 20-170-70, which regulates the design, operation, and maintenance of containers used to

transport solid and medical waste on state waterways. The specific part of the regulation challenged by JRA is subsection (D)(3)(a), which prescribes a 24-inch standing water test for determining whether a container is watertight. The second regulation at issue is 9 Va. Admin. Code § 20-170-195, which establishes the fees collected by facilities that receive solid and medical waste transported on state waters; specifically, subsection (B)(4), which prescribes a fee of $1.00 per ton of waste off-loaded at such facilities. It is JRA's contention that the challenged provisions violate the Virginia Waste Management Act, Va. Code § 10.1-1400 *et seq*. The Association also contends that the Waste Management Board ("Board") violated the procedural requirements of the Administrative Process Act ("APA"), Va. Code § 2.2-4000 *et seq*., in adopting the regulations. For the reasons that follow, the court agrees that the 24-inch standing water test violates the Virginia Waste Management Act. The court does not agree that the $1.00 fee violates the Waste Management Act or that the regulations violated the procedural requirements of the APA. The court will address these matters in reverse order.

*I. Administrative Process Act*

In order to fully understand JRA's contention that the regulations were adopted in violation of the procedural requirements of the APA, some background is necessary. In 1999, the General Assembly broadly restricted the transportation of waste by barge on Virginia's waterways, including a total ban on the James River. *See* former Va. Code §§ 10.1-1454.1(A)(d) and (B), and 10.1-1454.2. Intervenors Waste Management, Charles City County, and others filed suit in federal court challenging the constitutionality of those restrictions. The trial court found that the restrictions were unconstitutional. *Waste Mgmt. Holdings v. Gilmore*, 87 F. Supp. 2d 536 (E.D. Va. 2000). On appeal, the United States Court of Appeals for the Fourth Circuit affirmed nearly all of the trial court's rulings, but remanded a portion of the case for trial. 252 F.3d 316 (4th Cir. 2001), *cert. denied, Murphy v. Waste Mgmt. Holdings, Inc.*, 535 U.S. 904 (2002).

In December 2002 or January 2003, the federal litigation was settled, with the parties entering into an undated "Memorandum of Agreement." Among the terms of the agreement were (i) the Commonwealth would repeal the challenged restrictions; (ii) the Commonwealth, "through its appropriate agencies," would take all "reasonable and necessary" steps to complete the promulgation of certain regulations, including the 24-inch standing water test now at issue; and (iii) Waste Management and its affiliates, subsidiaries,

successors, and assigns consented to a fee "not to exceed $1.00 per ton" on waste carried by barge or vessel. The agreement was signed by counsel on behalf of the federal plaintiffs and by counsel for "Defendants W. Tayloe Murphy, Jr., in his official capacity as Virginia Secretary of Natural Resources, and Robert G. Burnley, in his official capacity as Director of the Department of Environmental Quality." The Board was not a party to the agreement.

Before and during the federal litigation, the Waste Management Board went about the process of formulating regulations to comply with the Waste Management Act. On July 6, 1998, the Board published a Notice of Intended Regulatory Action for the regulations, and comments were received between July 6 and August 14, 1998. In addition, the Department of Environmental Quality ("DEQ"), which is responsible for implementing Board regulations and otherwise assisting the Board in carrying out its statutory duties,[3] convened a Technical Advisory Committee of interested persons, including the executive director of JRA and representatives of Waste Management and Charles City County, to assist in the development of the regulations.

On September 11, 2000, the Board published proposed regulations for public comment, and public comments were received through November 13, 2000. A public hearing was held on October 18. The 24-inch standing water test was included in those proposed regulations. Specifically, it was proposed that waste containers would be tested for watertightness by filling each container with 24 inches of water for 15 minutes. If no water leaked out, the container would be deemed to be watertight.

In December 2000, in response to criticism, the 24-inch water test was replaced in the proposed regulations by a "soap bubble" or "pressure test." Under that test, a container is coated with a soap solution and air is pumped into the container. Bubbles form if there is a leak. The proposed regulations, including the soap bubble test, were adopted by the Board as the final regulations on December 18, 2000, and were published in the Virginia Law Register on January 15, 2001. On February 15, 2001, the Board suspended the regulations, apparently in response to a challenge filed in this court and to a petition for an additional comment period filed by residents of Tangier Island. The regulations were not "re-adopted" until the action of the Board now at issue. When they were, the soap bubble test was gone and the 24-inch standing water test was back.

---

[3] Va. Code §§ 10.1-1185 and 10.1-1186.

In arguing that the Board violated the procedural requirements of the APA, JRA contends that the Board was required to disclose to the public the existence and contents of the Memorandum of Agreement, including the provisions regarding the 24-inch standing water test and the $1.00 per ton fee, before or during the public comment period. Otherwise, claims JRA, the public's statutory right to comment on the proposed regulations was violated. Stated bluntly, it is JRA's argument that without disclosure, the public comment period was a sham. The court does not agree.

Virginia Code § 2.2-4007(E), which is part of the APA relied upon by the Association, provides:

> In formulating any regulation . . . the agency . . . shall afford interested persons an opportunity to submit data, views, and arguments, either orally or in writing, to the agency or its specially designated subordinate. However, the agency may begin drafting the proposed regulation prior to or during any opportunities it provides to the public to submit comments.

Section 2.2-4007(F) provides:

> [T]he proposed regulation and general notice of opportunity for oral or written submittals as to that regulation shall be published in the Virginia Register of Regulations. . . . All notices, written submittals, and transcripts, summaries, or notations of oral presentations, as well as any agency action thereon, shall be matters of public record in the custody of the agency.

Section 2.2-4007(I) provides:

> Before promulgating any regulation under consideration, the agency shall deliver a copy of that regulation to the Registrar together with a summary of the regulation and a separate and concise statement of . . . (ii) the purpose of the regulation, defined as the rationale or justification for the new provisions of the regulation, from the standpoint of the public's health, safety, or welfare. . . .[4]

---

[4] The Registrar referred to in the statute is the Registrar of Regulations appointed by the Virginia Code Commission pursuant to Va. Code § 2.2-4102.

JRA also cites *Water Control Bd. v. Appalachian Power*, 9 Va. App. 254, 386 S.E.2d 633 (1989), for the proposition that the APA "allows public participation in the formation of an agency's policies and agency dissemination to the public of information about the proposals." 9 Va. App. at 257. The statutory provisions and case law relied on by JRA do not support its argument.

Section 2.2-4007(E) requires the agency to afford interested parties an opportunity to submit data, views, and arguments. Such opportunity was afforded. Subsection (F) requires that the proposed regulation and notice of opportunity to submit data, views, and arguments be published. They were. It also requires that such notice and submissions, as well as any agency action thereon, be matters of public record. They are. Subsection (I) requires the agency to deliver to the Registrar of Regulations a statement of the purpose of the regulation, "defined as the rationale or justification for the new provisions of the regulation, from the standpoint of the public's health, safety, or welfare." While the Memorandum of Agreement may have been something the Board took into consideration in adopting the standing water test, it was not the purpose, "from the standpoint of the public's health, safety, or welfare," of the regulations. The purpose of the regulations was to regulate the transportation of waste on Virginia's waterways. In that regard, it is important to remember that the Waste Management Board was not a party to the Memorandum of Agreement, and there is no suggestion, nor can there be a suggestion, that it was bound by the agreement's terms. The Board is established by Va. Code § 10.1-1401 and is not "answerable" or subordinate to the Secretary of Natural Resources or the Director of the Department of Environmental Quality, the parties who signed the agreement on behalf of the Commonwealth. If anything, DEQ is "answerable" to the Board. There simply is nothing in the statute that requires the disclosure argued for by JRA.

The court also rejects JRA's argument that the court should interpret the APA in such a way as to require disclosure of the settlement before or during the public comment period. While the court can imagine good and compelling arguments for requiring such disclosure, the avoidance of impropriety and "back room deals" being one, it is not the court's function to read into statutes things that are not there. "If statutory language 'is clear and unambiguous, there is no need for construction by the court: the plain meaning and intent of the enactment will be given it.' . . . 'When an enactment is clear and unequivocal, general rules of construction of statutes of doubtful meaning do not apply'." *Moore v. Gillis*, 239 Va. 239, 241, 389 S.E.2d 453 (1990) (*quoting Brown v. Lukhard*, 229 Va. 316, 321, 330 S.E.2d 84 (1985)). The statute relied upon by JRA is clear and unambiguous. The court declines

JRA's invitation to add to it. In light of the court's ruling on this issue, the court does not decide whether the settlement was or was not disclosed, something about which the parties strongly disagree.

Lastly, with regard to JRA's argument that a procedural violation occurred, it must be kept in mind that JRA does not challenge the right or authority of the Commonwealth to enter into the Memorandum of Agreement. In light of the strong public policy in favor of settlement of contested litigation, such a challenge would undoubtedly fail. Nor is the situation in this case similar to the situation in *Virginia Bd. of Medicine v. Fetta*, 244 Va. 276, 421 S.E.2d 410 (1992), upon which JRA also relies. In *Fetta*, the issue was whether the Board of Medicine had properly revoked a chiropractor's license. This court found the revocation to be improper. The court then had to decide whether to remand the case to the Board of Medicine for further action or to terminate the revocation proceedings. Finding that it would be impossible for board members to disregard what had happened in the earlier, flawed proceedings, the court concluded that Dr. Fetta could not receive a fair hearing before that body. Accordingly, the case was remanded with instructions that the proceeding to revoke his license be terminated. That holding was affirmed on appeal.

What distinguishes *Fetta* from this case is that, in *Fetta*, the Board of Medicine was engaged in a process that required its members to be fair and impartial. Virginia Code § 54.1-110(B), which applies to proceedings before the Board of Medicine, provides:

> A board member shall disqualify himself and withdraw from any case in which he cannot accord fair and impartial consideration. Any party may request the disqualification of any board member by stating with particularity the grounds upon which it is claimed that fair and impartial consideration cannot be accorded. The remaining members of the board or panel shall determine whether the individual should be disqualified.

There is no requirement of impartiality here. In fact, § 2.2-4007(E) provides that "the agency may begin drafting the proposed regulation prior to or during any opportunities it provides to the public to submit comments." Even if some or all of the members of the Waste Management Board had already made up their minds how they would vote on the proposed regulations before or during the public comment period, the court is aware of no statutory prohibition against them doing so.

50

The court is also at a loss to understand how public disclosure of the settlement would have changed the outcome. It was known at the time of the public comment period leading up to the adoption of the regulations now at issue that the Board intended to adopt the 24-inch standing water test. Is JRA saying that it would have presented different data and arguments if it had known about the settlement? Just as the court assumes that JRA is now presenting the best argument it can to convince the court that the standing water test is not appropriate, the court assumes that JRA and others presented the best data and arguments they could to convince the Board of the same thing. Public disclosure of the settlement would have made no difference. JRA's procedural challenge is denied.

*II. $1.00 Per Ton Fee*

The court also holds that JRA has failed to carry its burden of demonstrating that the $1.00 per ton fee contained in 9 Va. Admin. Code § 20-170-195 is not supported by the record. To the contrary, the court finds that such fee is supported.

Virginia Code § 10.1-1454.1(C)(1) provides:

> The Board shall, by regulation, establish a fee schedule, payable by the owner or operator of any ship, barge, or other vessel carrying, loading, or off-loading waste regulated under this article on the navigable waters of the Commonwealth, for the purpose of funding the administrative and enforcement costs of this article associated with such operations including, but not limited to, the inspection and monitoring of such ships, barges, or other vessels to ensure compliance with this article, and for funding activities authorized by this section to abate pollution caused by barging of waste, to improve water quality, or for other waste-related purposes.

As can be seen, the fees in question are intended to cover several things: inspection and monitoring of barges and other vessels transporting waste, abating pollution caused by such transportation, improving water quality, and for other waste-related purposes. The record before the court clearly demonstrates that a fee of $.08 to $.10 per ton of off-loaded waste is sufficient to cover inspection and monitoring. Administrative Record at 04125-04128. JRA's argument, then, must be that there is not substantial evidence that $.90 or $.92 per ton of off-loaded waste is sufficient to cover the other items mentioned: abating pollution, improving water quality, and other waste-related

purposes. The Commonwealth and intervenors argue that the court must defer to the Board on that question. The court agrees with the Commonwealth and intervenors.

An agency's interpretation of statutory requirements is entitled to special weight in the courts. *Virginia A.B.C. Comm'n v. York St. Inn*, 220 Va. 310, 315, 257 S.E.2d 851 (1979):

> "The rationale of the statutory scheme is that the [administrative agency] shall apply expert discretion to the matters coming within its cognizance, and judicial interference is permissible only for relief against the arbitrary or capricious action that constitutes a clear abuse of the delegated discretion. The reviewing judicial authority may not exercise anew the jurisdiction of the administrative agency and merely substitute its own independent judgment for that of the body entrusted by the Legislature with the administrative function."

*Id.* (*quoting Schmidt v. Board of Adjustment of City of Newark*, 9 N.J. 405, 423, 88 A.2d 607, 615-16 (1952)). *See also Board of Zoning Appeals v. Fowler*, 201 Va. 942, 948, 114 S.E.2d 753 (1960).

The above principle is especially pertinent with regard to the fee issue in light of what is, and what is not, in the statute. Determining what is required to inspect and monitor ships, barges, and other vessels involved in the transportation of waste is reasonably ascertainable. The cost of hiring inspectors and of maintaining facilities and other related items can be budgeted for and stated with some degree of specificity. The other items in the statute cannot be. While the fee must be sufficient to abate pollution, there is no way to know at this time what pollution needs to be abated. The fee must be sufficient to improve water quality, but the statute is silent as to how and to what extent water quality is to be improved. The phrase "other waste-related purposes" can mean many things. Obviously, the legislature has left it up to the Board to determine how those goals should be accomplished. The court will also defer to the Board in that regard.

This court does not know what it takes or how much it costs to do the things the statute requires. The court is of the opinion, however, that, if inspection and monitoring of waste transportation can be accomplished for $.08 or $.10 per ton of off-loaded waste, it is far from unreasonable to conclude that the other things mentioned in the statute can be accomplished with the balance of the $1.00 fee. Since the burden is on JRA to show that the regulation is *not* supported by the record and since JRA has not pointed to

anything showing that the Board's fee is not sufficient, the court affirms the Board's adoption of that regulation.

*III. 24-Inch Standing Water Test*

The final challenge concerns the 24-inch standing water test. The court holds that the Board's adoption of that test was improper.
Virginia Code § 10.1-1454.1(A) provides, in pertinent part:

> The Board shall develop regulations governing the commercial transport, loading, and off-loading of nonhazardous solid waste . . . municipal and industrial sludge, and regulated medical waste by ship, barge, or other vessel upon the navigable waters of the Commonwealth as are necessary to protect the health, safety, and welfare of the citizens of the Commonwealth and to protect the Commonwealth's environment and natural resources from pollution, impairment, or destruction. . . . Also included in the regulations shall be requirements, to the extent allowable under federal law, that: (a) containers holding wastes be watertight and be designed, constructed, secured, and maintained so as to prevent the escape of wastes, liquids, and odors and to prevent the loss or spillage of wastes in the event of an accident; (b) containers be tested at least two times a year and be accompanied by a certification from the container owner that such testing has shown that the containers are watertight. . . .

It is JRA's contention that the 24-inch standing water test does not demonstrate that a container is watertight. The court agrees.

As previously discussed, the court recognizes its limited role in this type of proceeding. Where expertise in a particular area is called for, the court must, and gladly does, defer to the agency or board charged by the laws of the Commonwealth with regulatory and decision-making responsibility in that area. Contrary to the implicit, if not explicit, argument of the Commonwealth and intervenors, however, this court is not a "rubber stamp" of agency or board action. The constitution and laws of the Commonwealth demand that, in this type of proceeding, this court invalidate agency action where such action is not supported by the record or justified by statutory authority. Va. Code § 2.2-4027(ii) and (iv). There is no way that the 24-inch standing water test can demonstrate that the containers at issue in this proceeding are watertight.

Webster defines watertight as follows:

[O]f such tight construction or fit as to be impermeable to water except when under sufficient pressure to produce structural discontinuity.

*Merriam-Webster OnLine Dictionary* (http://aolsvc.merriam-webster.aol.com/home-aol.htm).

Based on the record, the typical container used to transport waste upon Virginia's waterways is metal and rectangular in shape. It is 40 feet long, 8 feet wide, and 9 feet high. It has a hinged door in front. Also based on the record, liquids, called "leachate," seep out of garbage. The watertightness requirement exists, at least in part, to prevent leachate from leaking out of a container during normal operation or in the event of an accident. Filling a 9-foot high container with 24 inches of water cannot possibly show that the container is watertight.

In defending the Board's action, the Commonwealth and intervenors insist that "watertightness" is a term of art that can properly be interpreted only by persons knowledgeable in the field. That simply is not true. The development of an appropriate test to determine watertightness requires expertise. In fact, expertise may be required in deciding whether watertightness is even necessary; that is, whether the risk of pollution through leakage of liquids is so miniscule that containers need not be watertight at all. But whether something is or is not watertight requires no expertise. If something holds water without leaking, it is watertight. If it does not hold water without leaking, it is not watertight. Since the statute requires containers to be watertight, whatever test is developed must demonstrate whether a container does or does not leak. The only thing the 24-inch standing water test demonstrates is that the bottom 24-inches of the container does not leak. It demonstrates nothing about the rest of the container, including the door, seams, and other joints. While the Commonwealth and intervenors argue that leachate is confined to the bottom of the container, in fact, at a level far below 24 inches, the statute requires that the *container* be watertight. That requirement is clear and unambiguous. *See Moore v. Gillis, supra.* It becomes even clearer when considered in light of the additional requirement, contained in the same statute, that containers be "designed, constructed, secured, and maintained so as to prevent the escape of wastes, liquids, and odors and to prevent the loss or spillage of wastes *in the event of an accident.*" Emphasis added. The standing water test is fine if nothing bad happens. Indeed, in a perfect world where accidents never happen, there would be no need for

testing at all. But this is not a perfect world. Accidents do happen. The General Assembly has mandated that waste containers be tested for watertightness. The 24-inch standing water test does not do that.

The court also rejects the argument of the Commonwealth and intervenors that the standing water test is sufficient because it is supplemented with a visual inspection of the rest of the container. Anyone who has ever attempted to fix a kitchen or bathroom pipe knows that visual inspections are useless. Only when the water is turned on will it be known whether the pipe leaks. In fact, if visual inspections are sufficient to determine watertightness, why have any other test at all? The 24-inch standing water test is a violation of Va. Code § 10.1-1454.1(A) and is invalid.

In making this ruling, the court is not suggesting that the soap bubble test previously discussed, or any other test, is the one the Board should adopt. The court is not an expert in these matters. It is up to the Board to determine what test is appropriate. In doing so, however, the Board must comply with the statute. It did not comply with the statute when it adopted the 24-inch standing water test.

The court is also aware that the Commonwealth may not adopt regulations that unconstitutionally restrict the right of Waste Management and others to transport waste on Virginia's navigable waters. *Waste Mgmt. Holdings v. Gilmore, supra*. In fact, there are probably tests that the Board could adopt that would practically guarantee watertightness but that would be so restrictive as to violate the Federal Constitution. The court does not know what tests are available or which ones will pass constitutional muster. There is nothing in the record before the court, however, to indicate that the 24-inch standing water test is the only test that is constitutional, and the Board did not cite the unavailability of other constitutionally allowed tests as a reason for adopting the 24-inch test. The statute requires a test that demonstrates watertightness. The court will not declare that requirement to be unconstitutional on the current record.

### IV. Attorney's Fees and Costs

Virginia Code § 2.2-4030(A) provides that, when a person brings an action such as this against a state agency:

[S]uch person shall be entitled to recover from that agency . . . reasonable costs and attorneys' fees if such person substantially prevails on the merits of the case and the agency's position is not

substantially justified, unless special circumstances would make an award unjust. The award of attorneys' fees shall not exceed $25,000.

In this case, JRA challenged the adoption of two regulations. It substantially prevailed on one. JRA also challenged the failure to publicly disclose the Memorandum of Agreement. It did not prevail on that issue. In light of the number of issues on which JRA was not successful and in light of the precarious position in which the Board finds itself with regard to federal litigation and constitutional issues, the court does not believe it is appropriate to award any fees or costs. No fees or costs will be awarded.